Lawrence D. MUNGIN, Appellee,

v.

KATTEN MUCHIN & ZAVIS, a/k/a Katten Muchin Zavis & Weitzman, f/d/b/a Katten Muchin Zavis & Dombroff, Appellant.

No. 96–7152.

United States Court of Appeals, District of Columbia Circuit.

Argued April 22, 1997.

Decided July 8, 1997.

Andrew L. Frey, Washington, DC, argued the cause for appellant. With him on the briefs was Donald M. Falk.

Abbey G. Hairston, Baltimore, MD, argued the cause for appellee. With her on the brief was Koteles Alexander, Silver Spring, MD.

Before EDWARDS, Chief Judge, WILLIAMS and RANDOLPH, Circuit Judges.

Opinion for the Court filed by Circuit Judge RANDOLPH.

Opinion concurring in part and dissenting in part filed by Chief Judge HARRY T. EDWARDS.

RANDOLPH, Circuit Judge:

In July 1994, Mark Dombroff left the law firm that bore his name—Katten Muchin Zavis & Dombroff—the Washington, D.C., branch of Chicago's Katten Muchin & Zavis. Principally because of Dombroff's departure, defections and terminations reduced the number of lawyers in the D.C. office from 42 to 14. Lawrence Mungin, an associate in the D.C. office, was among the lawyers who left the firm. He departed on July 25, 1994.

In September 1994, Mungin filed a racial discrimination charge with the EEOC. The EEOC took no action on his claim. Mungin then sued the firm and several of its current and former partners, asserting violations of 42 U.S.C. § 1981, Title VII, and the D.C. Human Rights Act. Pretrial proceedings eliminated the individual defendants from all claims and narrowed Mungin's § 1981 claim (but not his coextensive claims under Title VII and the D.C. statute) to the firm's failure to consider him for partnership the year before his departure. By special verdict, a jury found for Mungin, imposing liability on the firm for (1) race-based constructive discharge; and (2) racially discriminatory treatment with respect to (a) Mungin's starting salary, (b) his 1994 salary, (c) his work assignments, and (d) his consideration for partnership.

The jury awarded Mungin $1 million in compensatory damages, and an additional $1.5 million in punitive damages. After the district court entered judgment, and denied

Katten's motion for judgment as a matter of law, *see Mungin v. Katten Muchin & Zavis,* 941 F.Supp. 153, 155 (D.D.C.1996), the firm filed this appeal.

## I. Factual Background

A 1983 Harvard Law School graduate, Mungin had worked at several firms. Immediately before his move to Katten, he was an associate in the D.C. office of Powell, Goldstein, Frazer & Murphy.[1] When the Powell firm began experiencing financial difficulties it froze associate salaries. At the time, Mungin was making $87,000 per year. In February 1992 Mungin informed the Powell firm of his plan to leave that May. In March 1992, a legal headhunter sent Mungin's résumé to Dombroff, who was both the hiring partner and managing partner of Katten in D.C. Accompanying the résumé was the headhunter's note pitching Mungin: not only would Mungin bring with him a $250,000 to $500,-000 book of business, but "he is a minority." Letter from Peter Yenne, Keith Ross & Associates, Inc., to Mark Dombroff (Mar. 20, 1992).

When he interviewed with Dombroff in April, Mungin said he was interested in bankruptcy work and "was looking for a law firm with an established practice, because," contrary to headhunter's note, he "didn't have a book of business of" his "own." Trial Transcript at 147. Mungin also wanted to be considered for partnership the following year. Dombroff allayed Mungin's concerns. He told Mungin that he, as the biggest rainmaker at the firm, generated work, as did a new partner in the D.C. office, Jeff Sherman. Combined with the possibility of doing work with Katten's offices in Chicago and Los Angeles, Mungin "would be more than busy." *Id.* On the spot, Dombroff offered Mungin a position as a sixth-year associate, with annual pay of $91,000. As was the firm's policy, Mungin could be considered for partnership the following year.

Before accepting the offer, Mungin met with Jeff Sherman, the only bankruptcy partner in Washington. Sherman told Mungin that "there was plenty of bankruptcy" work in Washington, generated by Sherman himself, as well as by Dombroff, and that he "was hoping to get work from Chicago." *Id.* at 151. Mungin accepted the position at the Katten firm, contingent on being able to visit the firm's home office. Chicago was the headquarters of the firm's Finance and Reorganization department, the department encompassing the bankruptcy lawyers in Washington. Mungin joined the firm on May 1, 1992, and visited Chicago on June 3, 1992. In Chicago, Mungin met one of the two heads of the Finance Department, Laurie Goldstein; the other department head, Vince Sergi, was not available. Mungin's starting salary was $92,000, an amount he negotiated after the firm's initial offer of $91,000.

In the beginning, Mungin kept busy, receiving his work almost exclusively through Jeff Sherman and Mark Dombroff, with Sherman serving as Mungin's supervisor and mentor. Then the bankruptcy work started drying up. In February 1993, Sherman left the firm along with Stuart Soberman, the only other bankruptcy associate in Katten's D.C. office. Mungin thus wound up as the only bankruptcy attorney in the D.C. office.

Concerned about his partnership chances in an office without the work he was trained to perform or attorneys to supervise him, Mungin traveled to Chicago in February 1993 to meet more members of the Finance and Reorganization department. Mungin hoped his trip would result in the Chicago office referring more work to him. Although Vince Sergi was too busy to meet with Mungin, Mungin did meet with several attorneys and attended a department meeting where he was introduced to everyone.

The intra-firm marketing with the Chicago, as well as Los Angeles and Milan attorneys, proved unsuccessful. To keep Mungin busy, in April 1993 Sergi recommended that Mungin handle work then being done by a first-year associate in Chicago. Patricia Gilmore, a D.C. partner who worked closely with Dombroff, lowered Mungin's billing rate

---

1. Except where otherwise indicated, the facts presented in this introductory section are those that Mungin conveyed in his testimony at trial.

(which imperfectly reflected the level of responsibility with which he was entrusted) to $125 per hour, down from $185 per hour.

Meanwhile, it was coming time for Mungin's annual performance review. But at the designated time—October 1993—nothing happened. Mungin kept quiet, wanting to lie low while the firm accepted nominations for partnership. Although there was a buzz in the office about who was being considered for partnership, no partners told Mungin they would sponsor him for partnership.

Also in autumn 1993, the firm made its compensation decisions. Mungin received an annual bonus, in the amount of $4,000. His base salary for 1994 remained unchanged from 1993. Mungin asked the firm's human resources director why he had not received a raise; the director told him to talk to Sergi. If the firm's failure to give him a raise was not some sort of oversight, it made Mungin want the performance evaluation that much more: without an explanation of why the firm thought his performance sub-par, Mungin thought that he risked being denied a raise for the following year. Mungin scheduled a meeting for December 6, 1993, with Sergi and the new co-head of the department, David Heller.

When Mungin arrived in Chicago on December 6, Sergi was there, Heller was not. Sergi presented Mungin with the two performance reviews partners had prepared, one by Dombroff, the other by Gilmore; the other partners for whom Mungin had worked had not filled out the evaluation forms. Gilmore's evaluation was positive overall:

> Much of Larry's time is consumed by routine tasks, such as drafting status letters to our client. Occasionally we receive a challenging assignment from AIG [a large client], which Larry accomplishes with great skill. AIG is a very difficult client and Larry's ongoing efforts to coordinate with me have made a potentially troublesome situation, relatively easy. I do not believe that, for the most part, AIG offers challenging work to Larry. Larry nonetheless accomplishes the tasks for AIG with a helpful attitude and a willingness to tackle the unique problems this client presents.

Plaintiff's Exhibit II, *reprinted in* Joint Appendix 213. Sergi saw this not as a substantive evaluation—that is, a description of Mungin's skills and weaknesses—but as a testament to his affability. Sergi also stated that Gilmore was not respected by the firm, and that her opinions would not help Mungin achieve partnership. Dombroff's evaluation said that he was "not in a position to judge the quality of Larry's work," but that Mungin "has always appeared cooperative and willing to get the job done." Plaintiff's Exhibit HH, *reprinted in* Joint Appendix 209. Mungin gave Sergi the names of the other partners for whom he had worked so that Sergi could solicit evaluations from clients with whom Mungin had contact.

Mungin asked Sergi why he had not received a raise. Sergi responded that his name just had not come up in connection with compensation discussions or, for that matter, partnership considerations. Sergi told Mungin that although he had not been considered for partnership in 1993, he would still be eligible the following year. Mungin also asked Sergi for a marketing allowance, a perquisite usually reserved for partners seeking to recruit clients. Mungin never received the allowance. After the meeting the quality of work assigned to Mungin did not improve. He found himself still doing work he believed less-experienced attorneys could have performed. But on December 10, 1993, the firm did raise Mungin's salary to $108,000, retroactive to October 1, 1993.

Effective July 15, 1994, Dombroff and Gilmore would leave the Katten firm to form their own firm, Dombroff & Gilmore, P.C. In May 1994, Sergi called Mungin and asked him what he expected to do in the wake of Dombroff's and Gilmore's departure. Mungin was surprised by Sergi's question since he had assumed that in light of the departures, the firm would, as a matter of course, more closely integrate him into the Chicago bankruptcy practice. Instead, Sergi asked Mungin if he would consider moving to Katten's New York office. Mungin did not find this option appealing because the firm had no bankruptcy lawyers in New York. Mungin did not reject the New York option outright. Instead, he asked about the firm's severance

policies so that he could compare the benefits and drawbacks of leaving the firm with the alternative of moving to New York.

Shortly thereafter, Mungin spoke with Dick Waller, an attorney who had become an administrator in the Chicago office. Waller offered Mungin the additional option of relocating to Chicago. Mungin felt this option was not attractive since Sergi, in whose department Mungin would be working in Chicago, did not advance that option himself. On July 7, 1994, Mungin sent the following electronic mail message to Waller:

> Unfortunately, due to personal constraints and other considerations I cannot possibly move to New York or Chicago at this time. Because you have made it clear that there is not enough work in the D.C. office to keep me busy and that my only alternative is to be laid off, I would like to discuss an appropriate amount of time to search for a job and an appropriate departure date.

Electronic Mail Message from Lawrence Mungin to Richard Waller (July 7, 1994). Mungin arranged his severance with Waller: he would be terminated on July 25, 1994, and would receive severance pay through October 25, 1994.

After the EEOC failed to pursue Mungin's claim, on October 19, 1994, the firm reiterated its offer to transfer Mungin to either Chicago or New York, and for the first time offered to transfer him to Katten's Los Angeles office. The firm made clear that it would reimburse Mungin for any costs incurred in connection with a transfer, and that he would "continue to be considered for salary increases and partnership on the same basis as other associates." Letter from Allan B. Muchin, Managing Partner, Katten Muchin & Zavis, to Lawrence D. Mungin 1 (Oct. 19, 1994). The firm anticipated "that the work available in any of the other three offices" would put it "in a position to consider [Mungin] for partnership within a year." *Id.* at 2. Mungin thought these were not *bona fide* offers, and pursued the litigation that is now before us.

## II. Standard of Review

Title VII of the Civil Rights Act of 1964 makes it "an unlawful employment practice for an employer ... to discharge any individual, or otherwise discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of," among other protected categories, "such individual's race, [or] color." 42 U.S.C. § 2000e–2(a). District of Columbia law proscribes the same conduct. *See* D.C.CODE § 1–2512(a). If the firm discriminated against Mungin by not considering him for partnership—thus depriving him of the opportunity to enter a new contractual relationship with the firm, as partner—it violated 42 U.S.C. § 1981(a), which guarantees that all persons within the United States shall have the same right "to make and enforce contracts." *See Patterson v. McLean Credit Union,* 491 U.S. 164, 185, 109 S.Ct. 2363, 2377, 105 L.Ed.2d 132 (1989). The burdens of persuasion and production for claims raised under § 1981 or under the D.C. law are identical to those for claims alleging discriminatory treatment in violation of Title VII. *See Patterson,* 491 U.S. at 186–87, 109 S.Ct. at 2377–78 (42 U.S.C. § 1981); *American Univ. v. D.C. Comm'n on Human Rights,* 598 A.2d 416, 422 (D.C.1991) (D.C.CODE § 1–2512(a)(1)).

Under the Title VII scheme first described in *McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 802, 93 S.Ct. 1817, 1824, 36 L.Ed.2d 668 (1973), the burdens of production shift from employee to employer. The plaintiff "must first establish, by a preponderance of the evidence," a prima facie case of racial discrimination. *St. Mary's Honor Ctr. v. Hicks,* 509 U.S. 502, 506, 113 S.Ct. 2742, 2746–47, 125 L.Ed.2d 407 (1993). If the employee succeeds, the employer must introduce evidence of "some legitimate, nondiscriminatory reason" for its purportedly discriminatory action, *McDonnell Douglas,* 411 U.S. at 802, 93 S.Ct. at 1824, evidence "legally sufficient to justify a judgment for the" employer, *Texas Dep't of Community Affairs v. Burdine,* 450 U.S. 248, 255, 101 S.Ct. 1089, 1094–95, 67 L.Ed.2d 207 (1981). If the employer does so, "the presumption raised by the prima facie case is rebutted." *Id.* The burden of persuasion, having "at all times" been borne by the employee, then requires the employee to show that the em-

ployer's "proffered reason was not the true reason for the employment decision," *Hicks,* 509 U.S. at 508, 113 S.Ct. at 2747 (quoting *Burdine,* 450 U.S. at 256, 101 S.Ct. at 1095), "and that race was," *Hicks,* 509 U.S. at 508, 113 S.Ct. at 2747. Thus, "[w]here the defendant has done everything that would be required of him if the plaintiff had properly made out a prima facie case, whether the plaintiff really did so is no longer relevant." *U.S. Postal Serv. Bd. of Governors v. Aikens,* 460 U.S. 711, 715, 103 S.Ct. 1478, 1482, 75 L.Ed.2d 403 (1983).

Once the case has been fully tried, and the plaintiff and defendant have satisfied their burdens of production, "the *McDonnell Douglas* framework—with its presumptions and burdens—is no longer relevant." *Hicks,* 509 U.S. at 510, 113 S.Ct. at 2749. We therefore turn to the question whether Mungin met his burden of persuasion—that is, whether a reasonable juror could find that the firm discriminated against him on the basis of his race. *See Barbour v. Merrill,* 48 F.3d 1270, 1276 (D.C.Cir.1995).

### III. Mungin's Claims of Discrimination

We will examine each of Mungin's claims roughly in chronological order: first his 1992 salary; then his 1994 salary; the quality of his work assignments; partnership consideration; and finally, his discharge.

### A. Starting Salary

■ In support of his argument that his $92,000 starting salary was discriminatorily low, Mungin demonstrated that every sixth-year associate enjoyed a salary ranging from $95,000 to $102,000, that they were white and that he is black. The evidence showed, however, that Katten offered to associates who are lateral hires from firms paying less, salaries midway between the associate's former salary and the salary Katten pays its current associates.

Mungin never carried his burden of explaining how the firm's actual decision in his case was based on race. Not "all of the relevant aspects of" his "employment situation were 'nearly identical' to those" of the

associates to whom he compared himself. *Neuren v. Adduci, Mastriani, Meeks & Schill,* 43 F.3d 1507, 1514 (D.C.Cir.1995) (quoting *Pierce v. Commonwealth Life Ins. Co.,* 40 F.3d 796, 802 (6th Cir.1994)); *see also Byrd v. Ronayne,* 61 F.3d 1026, 1032 (1st Cir.1995). Mungin's mistake was comparing himself to homegrown associates, rather than to lateral entries like himself. Mungin offered nothing to show that the firm's reason for hiring him at $92,000 was pretextual. On appeal, he argues that Katten "never demonstrated that such a policy was ever consistently and systematically enforced." Supplemental Final Brief of the Appellee at 17. If this were so, we would have expected Mungin to point our attention to other associates to whom this policy was not enforced. He has not. Since it is Mungin's burden of persuasion, his argument without evidence fails to prove that the firm's reason was pretextual.

Mungin offers another reason for finding the firm's policy pretextual: "his base salary never caught up with the salary levels of Caucasian attorneys in his class." Supplemental Final Brief of the Appellee at 17. We fail to see what this has to do with his starting salary. While it is potentially evidence of the firm's later discrimination—discrimination with respect to Mungin's 1994 salary, for instance—it brings nothing to bear on whether the firm engaged in racial discrimination by starting him at $92,000.[2] *See Price Waterhouse v. Hopkins,* 490 U.S. 228, 241, 109 S.Ct. 1775, 1785–86, 104 L.Ed.2d 268 (1989) (noting that the "critical inquiry" is whether discrimination "was a factor in the employment decision *at the moment it was made*").

### B. 1994 Salary

■ As to Mungin's 1994 salary, he not only asserts that $108,000 was discriminatorily low, but he also complains that he had to ask for a raise. The firm, he says, did not provide him with the compensation review which would have led to his salary being raised *sua sponte.* The problem for Mungin is that he introduced no evidence that he was underpaid relative to his peers. He claims to

---

2. In any event, as we shall soon see, by 1994 Mungin did catch up.

have shown that the average base salary in 1994 for the 1986 class was $116,000, while he ultimately received $108,000. Mungin does not explain where the $116,000 figure comes from and we understand why. When the average base salaries of all associates are calculated—those in Washington, Chicago, and Los Angeles—we arrive at $116,000. But this calculation includes the mean salary in Los Angeles of $121,250, and in Chicago of $115,370. *See* Plaintiff's Exhibit 3, *reprinted in* Joint Appendix 142–45; Defendant's Exhibit K2, *reprinted in* Joint Appendix 228–31. The mean salary in Washington, excluding Mungin's, was $108,800. *See id., reprinted in* Joint Appendix 230. Mungin's unstated assumption must be that the firm's D.C. associates should receive the same salaries as those in the other cities. But he offered no proof of this and he did not give the jury any basis to conclude that these D.C. attorneys were similarly situated to their Chicago or Los Angeles counterparts.

Mungin also states that three of his colleagues in D.C., Dane Jacques, Jonathan Stern, and John Henderson, received base salaries of $120,000. Supplemental Final Brief of the Appellee at 11. Two of these individuals, Jacques and Stern, became partners during 1994, and their salaries were increased accordingly. Both made $120,000 in 1994. *See* Trial Transcript at 891. Mungin's situation is not comparable; he takes issue with his 1994 base salary as an associate, not a partner. Jacques's base salary as an associate was $115,000; Stern's was $117,000. *See* Plaintiff's Exhibit 3, *reprinted in* Joint Appendix 144; Defendant's Exhibit K2, *reprinted in* Joint Appendix 230. As to Henderson, Mungin cites no evidence to back up his claim that Henderson made $120,000; the record indicates that Henderson received $104,000. *Id.* When we use these salaries—Jacques's $115,000, Stern's $117,000, and Henderson's $104,000—along with those of the two other associates in D.C., Judith Rayner and John Enerson (each earning $104,-000), we arrive at the figure we mentioned earlier—$108,800, nearly identical to the salary Mungin received.

Thus, Mungin's 1994 salary was not discriminatorily low, and the district court recognized as much, stating in its Memorandum Opinion that "with respect to his salary for 1994, plaintiff has not shown and does not argue that his 1994 salary *level* was below that of similarly situated white lawyers." *Mungin*, 941 F.Supp. at 155. The only possible basis for inferring discrimination, then, deals with Mungin's seeking (and getting) a raise for 1994. The firm's putting him in the position of having to ask for a salary increase, Mungin asserts, discriminated against him on account of race.

At oral argument (and somewhat less clearly in its briefs), the Katten firm argued that in light of *Milton v. Weinberger*, 696 F.2d 94, 99 (D.C.Cir.1982), the fact that Mungin ultimately received his raise eliminated any potential liability for discrimination. As *Milton* makes clear, however, the noharm no-foul rule discussed in the opinion, a rule derived from *Day v. Mathews*, 530 F.2d 1083 (D.C.Cir.1976) (per curiam), "has nothing to do with whether a defendant is guilty of discrimination, but instead focuses on the question of *remedy*." *Milton*, 696 F.2d at 98. Furthermore, shortly after we decided *Milton*, we expressly rejected the application of *Day v. Mathews* to cases, such as this, alleging disparate treatment of an individual employee rather than of a group of employees pursuing litigation through a class action. *See Toney v. Block*, 705 F.2d 1364, 1368 (D.C.Cir.1983) (Scalia, J.); *see also Johnson v. Brock*, 810 F.2d 219, 224 (D.C.Cir.1987).

Katten is on more solid ground in observing that other circuits have reached the conclusion it seeks: that "interlocutory or mediate decisions having no immediate effect upon employment ... were not intended to fall within the direct proscriptions of ... Title VII." *Page v. Bolger*, 645 F.2d 227, 233 (4th Cir.1981) (en banc); *accord Dollis v. Rubin*, 77 F.3d 777, 781–82 (5th Cir.1995). *But see Hayes v. Shalala*, 902 F.Supp. 259, 266–67 (D.D.C.1995); *cf. Harris v. Forklift Systems, Inc.*, 510 U.S. 17, 22, 114 S.Ct. 367, 370–71, 126 L.Ed.2d 295 (1993). We have never decided the issue, however, and we do not need to do so here.

 Mungin never proved that in failing to receive a performance review or a raise the firm treated him differently than other

associates. One year earlier, Stuart Soberman, the white bankruptcy associate in the D.C. office, failed to receive a raise, and had to pursue the same sort of recourse Mungin did. Mungin also never showed that the firm's failure to give him a substantive evaluation was unusual. Although it was the firm's formal "policy" to provide substantive reviews semiannually, *see* Katten Muchin & Zavis Firm Reference Manual § 2.5 (Aug. 1991), an "employer's failure 'to follow its own regulations and procedures, alone, may not be sufficient to support' the conclusion that its explanation for the challenged employment action is pretextual." *Fischbach v. D.C. Dep't of Corrections,* 86 F.3d 1180, 1183 (D.C.Cir.1996) (quoting *Johnson v. Lehman,* 679 F.2d 918, 922 (D.C.Cir.1982)). When an employer's "departure from the prescribed procedure" has become "the norm," that departure "lends no support at all to the plaintiff's inference that" the employer's departure "is a pretext." *Fischbach,* 86 F.3d at 1183. Mungin presented no evidence that the firm ever consistently abided by its policy. The uncontroverted evidence in the record is that the firm at best sporadically provided substantive evaluations. The witnesses—whether put on the stand by Mungin or Katten—uniformly testified that they never received regular or formal reviews; the reviews they did receive amounted to no more than a pat on the back. *See* Trial Transcript at 597 (testimony of defense witness Mark Thomas); *id.* at 735 (testimony of defense witness Stuart Soberman); *id.* at 799 (testimony of plaintiff's witness Charles Thomson). As against this, Mungin presented nothing. We suppose he could have offered testimony of finance and reorganization attorneys who received the sort of meaningful review Mungin claims he was denied. But Mungin directs our attention to no such testimony, and scouring the record, we find none. The only witness even arguably in Mungin's favor was Elaine Williams. She was a young partner who switched from Katten's corporate department to the finance and reorganization department in 1990. As an associate, she was never reviewed by anyone in the finance and reorganization department, and as a partner she could not recall Chicago lawyers ever reviewing D.C. attor-

neys. Having presented no evidence to cast doubt on the firm's legitimate nondiscriminatory reasons, we conclude that no reasonable juror could find that the firm denied Mungin a review on the basis of his race.

## C. Work Assignments

Mungin's next complaint is that the firm discriminated against him by providing him with unchallenging work on the basis of his race. Katten conceded that Mungin received "routine bankruptcy work," and not the more sophisticated work for which he was hired. Brief for the Appellant, Final Version, at 26. But the firm showed that after the D.C. office's bankruptcy work dried up, causing Sherman and Soberman to depart in February 1993, it was left with no other bankruptcy lawyers in the D.C. office except Mungin, and with little bankruptcy work.

 Mungin tells us that to show pretext, he presented evidence of "numerous occasions where complex bankruptcy work originated from" Katten's "D.C. office only to be assigned to other" Katten "offices around the country." Supplemental Final Brief of the Appellee at 22. No such evidence exists. Mungin only introduced proof of one assignment rerouted from D.C. to Chicago—a matter in Chicago bankruptcy court handled by a partner and associate in Chicago who already had successfully handled a major, similar matter for the same client. Trial Transcript at 600–01, 808–09. This single instance is grossly insufficient to constitute a plausible discrimination claim. In an analogous context, we recently noted that the factfinder "may not 'second-guess an employer's personnel decision absent demonstrably discriminatory motive.'" *Fischbach,* 86 F.3d at 1183 (quoting *Milton v. Weinberger,* 696 F.2d at 100). Thus, when an employer makes a hiring decision, "[s]hort of finding that the employer's stated reason was indeed a pretext ... the court must respect the employer's unfettered discretion to choose among qualified candidates." *Fischbach,* 86 F.3d at 1183. The same standard holds true when an employer decides which of several qualified employees will work on a particular assignment. Perhaps in recognition of the judicial micromanagement of business practices that would

result if we ruled otherwise, other circuits have held that changes in assignments or work-related duties do not ordinarily constitute adverse employment decisions if unaccompanied by a decrease in salary or work hour changes. *See, e.g., Kocsis v. Multi–Care Mgmt.,* 97 F.3d 876, 886–87 (6th Cir. 1996); *Crady v. Liberty Nat'l Bank & Trust Co.,* 993 F.2d 132, 136 (7th Cir.1993); *see also Williams v. Bristol–Myers Squibb Co.,* 85 F.3d 270, 274 (7th Cir.1996). An employer has discretion to assign work to equally qualified employees so long as "the decision is not based upon unlawful criteria." *Burdine,* 450 U.S. at 259, 101 S.Ct. at 1097. The jury had no basis for thinking the Chicago attorneys who staffed the one matter Mungin identified were any less qualified than he, or that race played a factor in the firm's decision to staff the Chicago bankruptcy matter with attorneys in Chicago.

### D. Partnership Consideration

Next comes Mungin's claim that the firm unlawfully failed to consider him for partnership in the summer of 1993 and thus deprived him of the remunerative and other rewards partnership brings. Mungin does not argue that the firm must make every eligible associate a member of the firm's partnership. Instead, he claims that he "was unquestionably qualified to at least be considered for partnership pursuant to" Katten's "procedures," and that "he was the only eligible associate who was not formally evaluated." Supplemental Final Brief of the Appellee at 24.

Mungin introduced evidence that department heads would confer with the other partners in their departments to recommend particular associates for partnership. The recommendations then passed through several more committees—the committee comprised of all the department heads, the partnership review committee, the executive committee, and finally the board of directors—with names being screened out along the way.

The firm presented evidence to establish that Mungin's lack of sophisticated bankruptcy experience and that the disappearance of bankruptcy work for which he was hired precluded him from qualification for partnership.[3] As in the case of Mungin's 1994 pay, we need not decide whether an "interlocutory or mediate decision[ ] having no immediate effect on employment"—here the partnership nomination that would not have resulted in Mungin's becoming a partner—"fall[s] within the direct proscriptions of ... Title VII" or, for that matter, § 1981 or the D.C. statute. *Page,* 645 F.2d at 233.

■ Mungin never contested the fact that associates are screened out from consideration at the first round, when the department head and/or the partners in that department decide not to nominate certain associates to the committee of department heads. It was well within Sergi's authority to decline to recommend finance and reorganization department associates for partnership. Sergi testified that no one in his department could recommend Mungin for partnership, so no one did. Trial Transcript at 971. Mungin found himself in a bind. The insurance group headed by Dombroff tried to build a bankruptcy practice of its own, but failed. Mungin was left trying to secure partnership from a department in which no one had worked extensively with him. Mungin offered absolutely nothing that would have permitted a reasonable jury to conclude that the firm discriminated against him when it failed to consider him for partnership. He tried to establish that the insurance group headed by Dombroff had certain procedures for recommending partners. But the partnership decisions were made by departments, and in Mungin's case, by the finance and reorganization department, not the insurance department. Without any evidence that this department—the one that chose not to nominate him—acted discriminatorily, Mungin failed to prove a claim.

**3.** Katten also argued that Mungin's low billable hours explained why he was not considered for partnership. The facts on this subject were disputed, and we therefore assume that the jury did not credit the firm's explanation.

### E. Constructive Discharge

■ Mungin's last ground to support the verdict is his alleged constructive discharge. He claims the firm's offers to transfer him to New York, Chicago, or Los Angeles, were not *bona fide*, and that he deserved a more genuine offer to transfer to those offices, and more information so that he could make an informed decision whether to move. With respect to the computation of back pay, however, the district court concluded that Mungin "had no reasonable expectation of continued employment in Katten Muchin's Washington office after October 1994." *Mungin*, 941 F.Supp. at 156. The court based this decision on the following reasons:

> In July 1994, Katten, Muchin decided to close down the insurance practice that had provided work for plaintiff and a number of other lawyers in its Washington office. Between July and November 1994, defections and terminations reduced the number of lawyers in Katten, Muchin's Washington office from 42 to 14. The firm terminated all five of the Washington office associates whose work had been supported by Mark Dombroff's insurance clients but who were left behind by Dombroff's departure.

*Id.* We agree with the district court that Mungin had no reasonable expectation of continued employment, but unlike the district court, we find that this prevents Mungin from having any basis for a constructive discharge claim.

■ Even without the district court's finding, we would conclude that there was no constructive discharge. Circuit law is clear that a "finding of constructive discharge depends on whether the employer deliberately made working conditions intolerable and drove the employee" out. *Clark v. Marsh*, 665 F.2d 1168, 1173 (D.C.Cir.1981) (internal citations and modifications omitted). Constructive discharge thus requires a finding of discrimination and the existence of certain "aggravating factors." *Id.* at 1174; *see also Dashnaw v. Pena*, 12 F.3d 1112, 1115

(D.C.Cir.1994). (These "aggravating factors" are those things that would force an employee to leave. *Clark*, 665 F.2d at 1174.) Having rejected all of Mungin's disparate treatment claims, we are left without any discriminatory acts upon which Mungin could rest his constructive discharge claim. And, as the district court said, Mungin ultimately was treated better than his peers, for unlike the four white associates who, after Dombroff's departure, were terminated without the opportunity to relocate, Mungin had a chance to stay with the firm. We therefore conclude that the jury had no basis for a finding of constructive discharge.

### IV. Conclusion

Because the evidence was insufficient "for a reasonable jury to have reached the challenged verdict," the judgment of the district court is reversed and the case is remanded for entry of a judgment for the defendant.[4] *Barbour v. Merrill*, 48 F.3d 1270, 1276 (D.C.Cir.1995); *Kolstad v. American Dental Ass'n*, 108 F.3d 1431, 1436 (D.C.Cir.1997), *reh'g en banc granted* (May 28, 1997) (Nos. 96–7030 & 96–7047).

*Reversed and remanded.*

HARRY T. EDWARDS, Chief Judge, concurring in part and dissenting in part:

I dissent from the majority's reversal of the jury finding of discrimination. Although a close question, there was sufficient evidence for a reasonable jury to have concluded that Katten Muchin intentionally discriminated against Mungin on the basis of race.

I agree, however, that there was insufficient evidence to support a finding of "constructive discharge." The vast majority of Mungin's time at Katten Muchin was spent doing work for Mark Dombroff's and Patricia Gilmore's clients. Dombroff and Gilmore left Katten Muchin in July 1994 to form their own firm, and there was no record evidence to indicate that there was sufficient work in

---

**4.** Our holding is not affected by this court's decision in *Aka v. Washington Hospital Center*, 116 F.3d 876, 881–883 (D.C.Cir.1997), which dealt with the question whether plaintiffs need to show more than pretext in rebutting an employer's legitimate nondiscriminatory reasons. *Aka* held that no such extra showing is required. *See id.* In this case, however, Mungin either failed to establish a *prima facie* case or failed to offer *any* evidence showing that Katten's nondiscriminatory reasons were pretextual.

the D.C. office after their departure to support Mungin's continued employment. Indeed, four other associates lost their jobs at the same time as Mungin. As such, Mungin had no reasonable expectation of employment in the D.C. office after Dombroff's and Gilmore's departure. In addition, Mungin turned down offers to move to Katten Muchin's Chicago, New York, and Los Angeles offices, and it is undisputed that there was bankruptcy work in the Chicago office. Thus, I would reverse on the basis that no reasonable jury could have found that Mungin was constructively discharged. Because the compensatory and punitive damages were based in part on this finding, I would remand the damage awards to the District Court.