Opinion for the Court filed by Circuit Judge HENDERSON.
Dissenting opinion filed by Circuit Judge MILLETT.
KAREN LECRAFT HENDERSON, Circuit Judge:
Ella Ward was an attorney advisor at the Board of Veterans Appeals (BVA), a part of the United States Department of Veterans Affairs (VA). After developing a medical condition that required lengthy daily treatments and prevented her from sitting at a desk for long periods, she sought an accommodation allowing her to work full-time from home. Ward supported her request with two physicians’ letters containing terse descriptions of her *28 condition. When her supervisors asked for additional information to use in determining a reasonable accommodation, Ward resigned. She then sued Eric Shinseki (since replaced by Robert McDonald), in his capacity as Secretary of the VA, claiming the BVA had violated her rights under the Rehabilitation Act of 1973 (Act), 29 U.S.C. §§ 701 et seq., by failing' to accommodate her disability. Ward also claims she was constructively discharged because the failure to accommodate her disability left her with no choice but to resign. The district court granted summary judgment to the VA Secretary on both claims. We affirm.
I. Background
A. The Rehabilitation Act
“The Rehabilitation Act of 1973 governs employee claims of handicap discrimination against the Federal Government. Its basic tenet is that the Government must take reasonable affirmative steps to accommodate the handicapped, except where undue hardship would result.” Barth v. Gelb, 2 F.3d 1180, 1183 (D.C.Cir.1993). The Act provides that “[n]o otherwise qualified individual with a disability” shall be discriminated against by a federal agency “solely by reason of her or his disability.” 29 U.S.C. § 794(a).
The Act expressly incorporates the standards applied under the Americans with Disabilities Act (ADA). Id. § 794(d); see also 29 C.F.R. § 1614.203(b). The ADA in turn bars discrimination against a “qualified individual on the basis of disability,” 42 -U.S.C. § 12112(a), and defines “qualified individual” as “an individual who, with or without reasonable accommodation, can perform the essential functions of the employment position that such individual holds or desires,” id. § 12111(8); see Mogenhan v. Napolitano, 613 F.3d 1162, 1165 (D.C.Cir.2010); Woodruff v. Peters, 482 F.3d 521, 527 (D.C.Cir.2007). “[T]hat is, an individual with handicaps is ‘qualified’ if she can perform the essential functions of her position with reasonable accommodation. If she can perform these functions without reasonable accommodation, so much the better — she is, of course, still qualified.” Carr v. Reno, 23 F.3d 525, 529 (D.C.Cir.1994). A “reasonable accommodation” may include “job restructuring, part-time or modified work schedules ... and other similar accommodations for individuals with disabilities.” 42 U.S.C. § 12111(9)(B); accord 29 C.F.R. § 1630.2(o )(2)(ii).
B. Factual Background[1]
When a veteran’s claim for benefits is denied by a local or regional office of the VA, the veteran may appeal to the BVA. The judges who decide such appeals are assisted by attorney advisors who read the case files, review the evidence and prepare draft opinions. Beginning in 2001, Ward served as one such attorney advisor. Hers was the quintessential desk job — reading, writing, typing — with the only physical duty being that she had to carry sometimes unwieldy ease files from the judges’ offices to her desk. She typically worked eight- to ten-hour days and, like her colleagues, was expected to produce three “credits” per week — each credit corresponding to the preparation of roughly one case.
In 2005, Ward began to suffer from chronic severe lymphedema of the,lower right extremity, which causes her right foot and leg to swell with retained fluid. *29 The condition substantially limits Ward’s ability to go up and down stairs, carry moderately heavy case files and travel to and from work. It is exacerbated by long periods of sitting at a desk. To manage the condition, Ward must frequently drain excess fluid, elevate her leg, bandage it and/or place it in a compression machine. The treatments take one to three hours at a time and some require her to disrobe.
In mid-2006, Ward converted to part-time status for a few months so that she could receive treatments at the hospital. She returned to full-time status in September 2006. She also took some leave time pursuant to the Family Medical Leave Act (FMLA). Ward testified that she struggled at times to meet the three-credit per week expectation, see Joint Appendix (JA) 97-98, but it is undisputed that her final performance review, dated April 5, 2007, rated her “[f]ully [successful or better,” JA 447.
Ward’s condition began to deteriorate and in early 2007 she first requested an accommodation. After speaking in March 2007[2] with her then-supervisor Constance Tobias, in April Ward presented her interim supervisor Mark Greenstreet with a letter from Dr. David Rose, a cardiothora-cic and vascular surgeon. The letter was brief. It stated that Ward “has been receiving physical therapy treatments for a chronic medical condition of the right lower extremity that requires routine daily care at home” and that “she is unable to apply the treatment routinely at work, which exacerbates the condition.” JA 205. Rose’s letter concluded that Ward “will benefit from a schedule that allows her to work from home. The maximum number of daily work hours will be determined as the condition stabilizes.” JA 205.
On May 3, Ward met with Greenstreet, Jonathan Kramer and another supervisor to discuss her request. They asked for more details on Ward’s condition, which request Ward asked that they put in writing. Greenstreet did so. In a letter bearing the same date, he explained that he understood Ward to be “requesting an arrangement to work at home” but that “additional medical information is needed to process your request. Specifically, your physician needs to provide more details concerning the diagnosis and prognosis.” JA 243. The letter set forth the information the BVA needed so that it could evaluate Ward’s “ability to perform the duties of [her] position” and determine “what specific accommodations would be required.” JA243.
In late May, Ward submitted another letter, this time from Dr. Alice Fuisz, an internist. The letter contained the information set forth above regarding Ward’s condition and prescribed treatment. It explained that Ward “needs medical accommodations to work at home” because sitting for long periods exacerbates her condition and therefore Ward “should sit for only short intervals of time as tolerated, and be able to apply treatment routines whenever needed during the workday.” JA 195. Fuisz’s letter noted that the treatment routines “can take from 1 to 3 hours at a time” and that Ward’s “disability also affects travel to and from work, but she should be able to commute to work once a week as required [to retrieve new case files].” JA 195.
On May 25, Ward met with Steven Cohn, who had since replaced Greenstreet as Ward’s supervisor. Cohn told Ward to consider working part-time because he was concerned that she could not maintain a full-time schedule given the length of her daily treatments. On May 31, Cohn and *30 Ward met again, with Kramer also present this time. The parties’ accounts of that meeting differ. Cohn and Kramer attested that they were concerned Ward could not maintain a full-time schedule given her condition and the length of daily treatments and therefore asked for more information from her physician specifying that she was able to work full-time. Ward attested that Cohn and Kramer flatly denied her full-time work-from-home request during the meeting, instead offering her a part-time work-from-home accommodation. Ward asked that the BVA’s decision on her accommodation request be put in writing.
As requested, on June 5, Cohn sent a memo to Ward which “serve[d] to followup on the May 31, 2007 meeting.” JA 246. The memo stated that “the [BVA] will strive to provide you with a reasonable accommodation” but that, as discussed in the meeting, “it is not evident to the [BVA], based on the medical documentation you have provided, that the [BVA] can reasonably accommodate your request for a flexiplace [work-from-home] arrangement.” JA 246. The memo outlined two questions left unanswered by Ward’s physicians’ letters. First, the memo asked whether Ward would be able to carry case flies to and from work once a week. Second, it noted that Ward’s job requires sitting at a desk for prolonged periods — a requirement which would be no different in a work-from-home arrangement — and expressed concern whether, factoring in time for treatment, Ward would be able to log sufficient hours to meet a full-time schedule. JA 246-47. Accordingly, the memo asked that Ward obtain a letter from her physician addressing these two questions so that the BVA could “process [Ward’s] request for a flexiplace arrangement.” JA 247. The memo did not state any decision — one way or the other — on Ward’s accommodation request.
Ward did not respond. Instead, on June 11, she submitted a letter of resignation. On June 22, she asked that her resignation not take effect — and that she remain on leave-without-pay status under the FMLA — until the Office of Personnel Management adjudicated her pending claim for disability retirement benefits. Then, on July 30, Ward sent a letter to the BVA’s human resources personnel asking that the BVA “immediately terminate the deferred status of my resignation and process my involuntary resignation/constructive discharge immediately.... Because of BVA’s illegal and discriminatory actions in denying a reasonable accommodation for my chronic disability by allowing me to work at home as many other attorneys with disabilities do at the BVA, I was forced out of my job and had no recourse but to resign.” JA 258.
In response, a BVA personnel officer sent Ward a letter dated August 8. The letter disputed Ward’s assertions that her accommodation request had been denied and that she had been forced to resign. It changed the BVA’s tune on the need for more information, however, stating: “[A]l-though you never submitted any additional medical information as requested, the [BVA] has nevertheless reconsidered your reasonable accommodation request and is willing to consider allowing you to try work-from-home on a full-time basis.” JA 261. The letter asked that Ward respond within five days of August 8, but Ward attested that she did not receive it until more than five days later. She never responded.
C. District Court Proceedings
Ward obtained a notice of right to sue from the Equal Employment Opportunity Commission (EEOC) and timely filed suit in district court. Her complaint alleged *31 two violations of the Act: (1) the BVA failed to accommodate her disability; and (2) in so doing, the BVA constructively discharged her by deliberately creating intolerable working conditions, thus leaving her no choice but to resign. After discovery, the parties cross-moved for summary judgment.
The district court granted summary judgment to the YA Secretary on both claims. Ward v. Shinseki, No. 10-cv-1414, 2012 WL 5839711 (D.D.C. Nov. 19, 2012), reprinted in JA 862-81. It reached three conclusions with respect to Ward’s failure to accommodate claim: (1) the BVA acted in good faith by engaging in an interactive process to determine a reasonable accommodation but Ward walked away from that process, see JA 873-76; (2) the BVA’s August 8 letter offered Ward the very accommodation she sought, see JA 876-79; and (3) Ward had not demonstrated that she could perform the essential functions of her job with an accommodation, see JA 879-80. Having rejected Ward’s failure to accommodate claim, the district court held that her constructive discharge claim failed a fortiori. JA 880-81.
Ward timely appealed. We review the district court’s grant of summary judgment de novo. Mogenhan, 613 F.3d at 1165. “Summary judgment is appropriate only if ‘there is no genuine issue as to any material fact and ... the movant is entitled to judgment as a matter of law.’ ” Id. (quoting Fed.R.CivP. 56(c)(2)). “A dispute about a material fact is not ‘genuine’ unless ‘the evidence is such that a reasonable jury could return a verdict for the nonmov-ing party.’ ” Id. (quoting Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986)).
II. Failure to Accommodate Claim
To prevail on her claim that the BVA failed to accommodate her disability, Ward must produce sufficient evidence that (1) she was a qualified individual with a disability, (2) the BVA had notice of her disability and (3) the BVA denied her request for a reasonable accommodation. Stewart v. St. Elizabeths Hosp., 589 F.3d 1305, 1307-08 (D.C.Cir.2010). Ward bears the burden of proving these elements by a preponderance of the evidence. Barth, 2 F.3d at 1186. The second element is undisputed: The BVA had notice of Ward’s condition. The district court concluded that Ward had not satisfied the first element because she failed to demonstrate that she could perform the essential functions of her job with an accommodation. See JA 879-80. We express no opinion on that conclusion, however, because we agree with the district court that Ward failed to satisfy the third element: No reasonable jury could find that Ward’s accommodation request was denied in light of the BVA’s continuing good-faith dialogue with Ward to determine an appropriate accommodation, which dialogue was cut short by Ward’s sudden resignation. See JA 873-76.
New disabilities are amenable to one-size-fits-all accommodations. To meet its obligations under the Act, then, an employer needs information about the nature of the individual’s disability and the desired accommodation — information typically possessed only by the individual or her physician. An individual seeking accommodation need not provide medical evidence of her condition in every case: “[A]n employee confined to a wheelchair would hardly need a doctor’s report to show that she needed help in getting to her workstation if this were accessible only by climbing a steep staircase.” Langon, 959 F.2d at 1058. But “[w]hen the need for an accommodation is not obvious, an employer, before providing a reasonable aceom- *32 modation, may require that the individual with a disability provide documentation of the need for accommodation.” Stewart, 589 F.3d at 1309 (quoting 29 C.F.R. pt. 1630 app. § 1630.9). EEOC regulations therefore provide:
To determine the appropriate reasonable accommodation it may be necessary for the [agency] to initiate an informal, interactive process with the individual with a disability in need of the accommodation. This process should identify the precise limitations resulting from the disability and potential reasonable accommodations that could overcome those limitations.
29 C.F.R. § 1630.2(o)(3); see also Mogenhan, 613 F.3d at 1167 & n. 4.
The process contemplated is “a flexible give-and-take” between employer and employee “so that together they can determine what accommodation would enable the employee to continue working.” EEOC v. Sears, Roebuck & Co., 417 F.3d 789, 805 (7th Cir.2005) (quotation marks omitted); see also Mogenhan, 613 F.3d at 1167-68 & n. 4; Stewart, 589 F.3d at 1308-09. “[N]either party should be able to cause a breakdown in the process for the purpose of either avoiding or inflicting liability.” Sears, 417 F.3d at 805 (quotation marks omitted). Thus,
courts should look for signs of failure to participate in good faith or failure by one of the parties to make reasonable efforts to help the other party determine what specific accommodations are necessary. A party that obstructs or delays the interactive process is not acting in good faith. A party that fails to communicate, by way of initiation or response, may also be acting in bad faith. In essence, courts should attempt to isolate the cause of the breakdown and then assign responsibility.
Id. (quotation marks omitted); accord Taylor v. Phoenixville Sch. Dist., 184 F.3d 296, 312 (3d Cir.1999). For instance, “when the parties are missing information that can only be provided by one of the parties, the party withholding the information may be found to have obstructed the process.” Jackson v. City of Chi., 414 F.3d 806, 813 (7th Cir.2005) (quotation marks omitted); accord Stewart, 589 F.3d at 1308-09. In sum, to establish that her request was “denied,” Ward must show either that the BVA in fact ended the interactive process or that it participated in the process in bad faith.
Here, the interactive process broke down before the BVA decided on Ward’s request and no reasonable juror could have found that the BVA, rather than Ward, was responsible for the breakdown. Ward first asked for an accommodation in March. In April, Ward presented her supervisor with a brief letter from her physician saying little more than that she was receiving treatment for a chronic medical condition that requires daily treatment and would “benefit from a schedule that allows her to work from home.” JA 205. The letter cast doubt on Ward’s capacity to continue working full-time, however, by stating that “[t]he maximum number of daily work hours will be determined as the condition stabilizes.” JA 205. Accordingly, on May 3, Ward’s supervisors met with her in person and requested more information about her condition. They repeated the request in writing the same day, setting forth the information needed by the BVA to evaluate Ward’s “ability to perform the duties of [her] position.” JA 243. Ward produced a letter from another physician in response but it too left doubt about her ability to work full-time by noting that she could not sit for long periods and that her treatments take one to three hours at a time. On May 25 and 31 — i.e., within days of receiv *33 ing the physician’s letter — Ward’s supervisors twice met with her to discuss her request.[3] On June 5, the BVA set forth in writing precisely the information it needed to “reasonably accommodate [Ward’s] request for a [work-from-home] arrangement.” JA 246. Ward did not respond but instead resigned six days later. As the district court concluded, the interactive process broke down when Ward “walked away.” JA 874.[4]
We addressed similar circumstances in Stewart, in which the plaintiff was a housekeeper at a mental facility whose interactions with the patients caused her own mental health to deteriorate. 589 F.3d at 1306-07. When the plaintiff requested a transfer, a supervisor promptly met with her and told her that he would help her as soon as she completed paperwork documenting her disability. Id. at 1307. She left work that afternoon and never returned. Id. She sued, claiming her employer had denied her a reasonable accommodation but the district court granted the employer’s motion for judgment as a matter of law. Id. We affirmed because “[n]othing in the evidence presented suggested] that [the supervisor] acted in anything but an entirely appropriate manner” when he met with the plaintiff and requested medical documentation. Id. at 1308-09. In so holding, we cited two cases from our sister circuits that closely resemble Ward’s case. See id. at 1309 (citing Beck v. Univ. of Wis. Bd. of Regents, 75 F.3d 1130, 1136 (7th Cir.1996) and Templeton v. Neodata Servs., Inc., 162 F.3d 617, 619 (10th Cir.1998)).
In Beck, the plaintiff was a secretary who suffered from arthritis, depression and anxiety. 75 F.3d at 1132. Upon returning from medical leave, she asked for an unspecified accommodation for her depression. The employer sought further information from her physician but none was provided. Id. at 1133. The plaintiff took another period of medical leave and again sought an accommodation upon her return. This request was somewhat more specific — it sought an adjustable keyboard for her arthritis and a reduced workload to ease the transition back to work. The request was also accompanied by a letter from her physician. Id. Still uncertain what accommodations were necessary, the employer again sought more detailed information and got none. Id. The employer also took steps to accommodate the plaintiff based on the information it had but was unable to accommodate the plaintiff to her satisfaction. Id. at 1136-37. She sued and the Seventh Circuit affirmed the district court’s grant of summary judgment to the employer because “[a]t no point did the [employer] fail to respond in some manner *34 to [the plaintiffs] requests for accommodation, and there is nothing in the record from which we can discern any attempt by the [employer] to sweep the problem under the rug.” Id. at 1136. The court observed that “the information required to determine the necessary accommodations was of the type that only [the plaintiff] could provide” and “where ... the employer makes multiple attempts to acquire the needed information, it is the employee who appears not to have made reasonable efforts.” Id. at 1137.
In Templeton, the plaintiff suffered serious head and neck injuries in an automobile accident. 162 F.3d at 618. Her physician sent her employer a letter explaining her condition and expressing uncertainty as to the plaintiffs ability to return to work. The employer requested further information from the physician but the plaintiff refused to authorize the information’s release. Id. The Tenth Circuit affirmed the district court’s grant of summary judgment to the employer, explaining that “[a]n employer cannot be expected to propose reasonable accommodation absent critical information on the employee’s medical condition and the limitations it imposes.” Id. at 619.. Also in accord is Jackson, in which the Seventh Circuit affirmed the district court’s grant of summary judgment to the employer because the employer sent the plaintiff several letters asking for more detailed medical information and got only conclu-sory responses. 414 F.3d at 813-14. By contrast, cases in which our sister circuits have found genuine issues of fact regarding the responsibility for the breakdown of the interactive process typically include evidence that the employer was in some way unresponsive to the plaintiffs requests for accommodation. See, e.g., Sears, 417 F.3d at 807-08 (plaintiff “made several requests for accommodations which [the employer] simply denied” and employer, “unlike the defendants in [Beck and Jackson,'] ... did not actively engage in the interactive process by suggesting possible accommodations or requesting information that would help it do so”); Fjellestad v. Pizza Hut of Am., Inc., 188 F.3d 944, 952-53 (8th Cir.1999) (employer did not discuss possible accommodations with employee); Taylor, 184 F.3d at 315-16 (notwithstanding fact that plaintiffs son “requested accommodations [for plaintiff], informed [the employer] about [plaintiffs] condition, and- provided [the employer] with the means to obtain more information if needed,” employer “offered no accommodations or assistance in finding them, made [plaintiffs] job more difficult, and simply sat back and continued to document her failures”).
Here, the BYA’s participation bore all the hallmarks of good faith. Ward’s supervisors promptly responded to her request for an accommodation, met with her on several occasions to discuss the request and sought more information from her physician to help them determine an appropriate accommodation. Like the plaintiffs in Stewart, Beck, Templeton and Jackson, Ward did not provide the requested information. Instead, she resigned. No reasonable juror could have found that the BVA denied Ward’s request for an accommodation, then, because Ward abandoned the interactive process before the BVA had the information it needed to determine the appropriate accommodation.[5] The dis *35 trict court correctly awarded summary judgment to the VA Secretary because Ward “fail[ed] to make a showing sufficient to establish the existence of an element essential to [her] case.” Celotex Corp. v. Catrett, 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986).[6] Ward is the author of her misfortune — she and the BVA parted ways not because the BVA discriminated or retaliated against her based on her disability but because she acted precipitately.
III. Constructive Discharge Claim
Ward contends that she was constructively discharged because the BVA’s “continued refusal[,] obstruction and delay in accommodating [her] limitations made working conditions so intolerable that any reasonable person with her disability would feel compelled to resign.” Br. of Appellant at 50, Ward v. Shinseki, No. 12-5374 (D.C.Cir. Nov. 13, 2013). A claim of constructive discharge based on disability discrimination “must be predicated on a showing of either intentional discrimination, or retaliation.” Mayers v. Laborers’ Health & Safety Fund of N. Am., 478 F.3d 364, 370 (D.C.Cir.2007) (quotation marks omitted); see also Johnson v. Shalala, 991 F.2d 126, 131-32 (4th Cir.1993) (elements of constructive discharge not met by failure to accommodate absent “evidence that the employer intentionally sought to drive [employee] from her position”); cf. Mungin v. Katten Muchin & Zavis, 116 F.3d 1549, 1558 (D.C.Cir.1997) (under Title VII of the Civil Rights Act of 1964, “a finding of constructive discharge depends on whether the employer deliberately made working conditions intolerable *36 and drove the employee out” (quotation marks omitted)). We have already concluded that the BVA did not deny Ward’s accommodation request but rather responded promptly and in good faith. Ward’s inability to make out a claim of failure to accommodate “necessarily means that her constructive discharge claim fails.” Cole v. Powell, 605 F.Supp.2d 20, 26 (D.D.C.2009).
For the foregoing reasons, we affirm the district court’s grant of summary judgment to the VA Secretary.

So ordered.

. Because we are reviewing the district court's grant of summary judgment to the VA Secretary, we view the evidence in the light most favorable to Ward. Mogenhan, 613 F.3d at 1165; Langon v. Dep’t of Health & Human Servs., 959 F.2d 1053, 1058 (D.C.Cir.1992).

. Unless otherwise indicated, all events occurred in 2007.

. Ward’s deposition testimony that her request was denied at the May 31 meeting differs from the testimony of the other participants in the meeting. Although we view the evidence in the light most favorable to Ward, the letter Ward received on June 5 (and had asked for at the meeting) made clear that, whatever was said at the meeting, her accommodation request was still under consideration.

. As noted, the district court also concluded that no reasonable juror could find Ward's request had been denied because the BVA "offered her the exact accommodation she sought” in its August 8 letter. JA 877. Because we conclude the interactive process had broken down when Ward resigned two months earlier, we need not address whether the BVA's August 8 letter — which said the BVA was "willing to consider allowing [Ward] to try work-from-home on a full-time basis,” JA 261 — in fact offered her the accommodation she sought or whether the letter is further evidence of the BVA's willingness to continue the dialogue. We note, however, that the August 8 letter came after Ward had made plain her intent to sue. See JA 258. The BVA’s offer in the face of litigation cannot be viewed as evidence of pretext.

. Ward notes that the BVA has a "flexiplace” or "telework” policy whereby BVA employees whose job duties and performance records meet certain criteria may work from home with the approval of their supervisor. See JA 804, 807-08; see also JA 654-57. The existence of such a policy and any history of the employer allowing similarly situated employees to work from home are undoubtedly relevant to whether a work-from-home arrange *35 ment is a reasonable accommodation. See Woodruff, 482 F.3d at 528. But in those instances where the BVA granted other employees’ work-from-home requests due to disabilities, adequate medical documentation had been provided. See JA 518-22, 662-67, 815. Our dissenting colleague appears to view the full-time telework arrangement as the rule, not the exception, and concludes that the BVA must immediately grant the request of any fully successful employee who seeks to work from home. See Dissenting Op. 36-37. The reverse is true. See JA 807 ("Position suitability and availability of staff and resources are considerations for management when determining employee participation [in a telework arrangement].... VA employees selected for telework arrangement ... should have a history of being reliable, responsible, and able to work independently.... The supervisor is responsible for determining how many days per week are appropriate for a telework arrangement. Each arrangement to telework is to be considered individually." (emphasis added)). Although it might have been reasonable for the BVA to permit Ward to work from home, it does not follow that the BVA exhibited bad faith by not immediately granting Ward that accommodation without further inquiry. Cf. Mogenhan, 613 F.3d at 1168 (noting "there are certainly circumstances in which a long-delayed accommodation could be considered unreasonable" (quotation marks omitted)). There was no long delay here. No more than three months passed from Ward's first request to her resignation and much of that time was spent waiting for Ward to provide more information about her condition. Had the process been allowed to play out, the BVA may well have settled on a full-time work-from-home accommodation; it may instead have thought of other reasonable accommodations. Ward cannot cut the process short and then blame her employer for not immediately granting her specific request.

. Our dissenting colleague deems the information sought by the BVA in the June 5th letter "irrelevant.” Dissenting Op. 36. We disagree. Whether it was an "essential feature[] of Ward's job,” id. at 37, to sit for prolonged periods or to carry heavy case files, Ward's ability to perform these tasks was unquestionably relevant in determining a reasonable accommodation. By asking these questions, the BVA sought — as EEOC regulations instruct — to know the "precise limitations resulting from the disability” so that it could determine “potential reasonable accommodations that could overcome those limitations.” 29 C.F.R. § 1630.2(o )(3).