**Kennieth F. THOMPSON, Plaintiff,**

v.

**THE CAPITOL POLICE BOARD, Defendant.**

**No. CIV.A. 97–2624(RMU).**

United States District Court, District of Columbia.

Oct. 26, 2000.

Lolita James Martin, Martin & James, Bowie, MD, LaJuan Martin, Washington, DC, for Plaintiff.

Jean M. Manning, Toby R. Hyman, Rebecca Womeldorf, Erica A. Watkins, Michael J. Yoch, U.S. Senate, Office of Chief Counsel for Employment, Washington, DC, for Defendant.

## MEMORANDUM OPINION

URBINA, District Judge.

### GRANTING THE DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

### I. INTRODUCTION

This matter comes before the court on the defendant's motion for summary judgment. The plaintiff, Kennieth F. Thompson ("the plaintiff" or "Mr. Thompson") brought this suit for damages under the Congressional Accountability Act ("CAA"), 2 U.S.C. §§ 1301–1438. He claims that the defendant, the United States Capitol Police ("the defendant" or "the Capitol Police"), discriminated against him on the basis of his race. Specifically, the plaintiff, who is African–American, alleges that the defendant fired him from his position as a Capitol Police officer when he was injured, while allowing similarly situated white officers to retain their jobs. Additionally, the plaintiff asserts that the defendant demonstrated a pattern and practice of racial discrimination against him or African–American employees throughout his employment.

The defendant moves for summary judgment based on lack of subject-matter jurisdiction.[1] The defendant claims that the plaintiff failed to exhaust his administrative remedies by failing to request counseling by the Office of Compliance within 180 days of the alleged violations, as required by the CAA. Thus, the defendant argues that the plaintiff's claims are time-barred. The plaintiff counters that the doctrine of equitable tolling should allow his claim to proceed. For the reasons that follow, the court holds that because the plaintiff presents no facts that would justify applying the doctrine of equitable tolling, his claims are time-barred. Accordingly, the court concludes that the plaintiff has failed to exhaust his administrative remedies, and will grant the defendant's motion for summary judgment. Lastly, because the court holds that it lacks subject-matter jurisdiction, the court need not address the defendant's remaining arguments.

### II. BACKGROUND

Mr. Thompson, an African–American man, worked for the United States Capitol Police from 1974 until February 1997, when his employer officially terminated him. *See* Third Amended Complaint ("Compl.") at 2, 4–5. At the time of Mr. Thompson's termination, he held the rank of Administrative Sergeant. *See id.* at 2. During the plaintiff's employment with the Capitol Police, he suffered three on-the-job injuries. The first injury occurred in February 1979, when Mr. Thompson hurt his knee while pushing a scout car in the snow. *See* Defendant's Statement of Un-

---

1. Although the defendant styles its motion as one for summary judgment, the gravamen of its motion is a motion to dismiss for failure to exhaust administrative remedies. Accordingly, the court will treat the defendant's motion as a motion to dismiss for lack of subject-matter jurisdiction pursuant to Federal Rule of Civil Procedure 12(b)(1). *See* 5A CHARLES ALAN WRIGHT & ARTHUR R. MILLER, FEDERAL PRACTICE AND PROCEDURE § 1350 (1990) (noting that in these instances courts often "treat the motion for summary judgment as a 'suggestion' of lack of subject matter jurisdiction...").

disputed Material Facts in Support of Its Motion For Summary Judgment ("Def.'s Statement") at 4. The second injury occurred in 1985 when a tourist drove into Mr. Thompson's scout car, injuring his left hand and knee. *See id.* The third injury occurred during a police demonstration in April 1993 when Mr. Thompson ruptured a tendon in his right foot. *See* Compl. at 7. As a result of these injuries, the plaintiff had several surgical operations, and went on both non-duty status and restricted-duty status at various times. *See* Def.'s Statement at 4.

On May 17, 1996, the plaintiff was diagnosed with degenerative knee problems. The plaintiff's doctor concluded that with the restrictive range of motion and limitations to the knee, Mr. Thompson could no longer safely continue regular police duties. The doctor diagnosed the plaintiff's knee problems as permanent, and informed Mr. Thompson that nothing more could be done. *See* Def.'s Statement at 4.

In June 1996, Sergeant Wendy Clark of the Capitol Police spoke to the plaintiff about his options under United States Capitol Police General Order 2030, which states in part, "Members/employees who are unable to return to a Full Unrestricted Duty Status after a one year period in Non–Duty and/or Restricted Duty status should apply for Disability Retirement, Workers' Compensation, or Time Retirement; or they may be separated from the Department without benefits." Plaintiff's Opp'n to Mot. for Summ. J. ("Pl.'s Opp'n") at 4. On June 19, 1996, Mr. Thompson submitted a memorandum addressed to Chief Gary Abrecht requesting a transfer to the Office of Workers' Compensation Programs' (OWCP) temporary rolls. *See* Def.'s Statement at 5. Acknowledging that his injuries were work-related, the Capitol Police granted Mr. Thompson's transfer to the OWCP rolls. *See* Mot. for Summ. J., Ex. 2.

Next, in a memorandum dated September 25, 1996, Deputy Chief Fentress A. Hickman informed Mr. Thompson that he would be transferred to the OWCP rolls after exhausting his accrued annual and compensatory leave, and that he would be placed on terminal leave effective October 1, 1996. *See* Def.'s Statement at 6. Mr. Thompson understood that he would be separated from the rolls of the Capitol Police after he exhausted his terminal leave in February 1997. *See id.*; Pl.'s Opp'n at 5.

On April 1, 1997, the plaintiff requested counseling from the United States Capitol Police Board's Office of Compliance, alleging that he had suffered race-based discrimination. The plaintiff claimed that white officers who had disabilities that were similar to or more severe than his were accommodated and allowed to remain employed at full-duty status. The plaintiff also claimed that one of the reasons the Capitol Police fired him was a racially motivated desire to prevent his participation in the 1996 promotional process for Lieutenant. *See* Def.'s Statement at 7. Furthermore, the plaintiff alleges that throughout his employment with the Capitol Police, he encountered a pattern of race-based discrimination. *See* Compl. at 5.

In his opposition to the defendant=s motion for summary judgment, Mr. Thompson points to several occasions in which he claims he suffered discrimination during his career. *See* Pl.'s Opp'n at 10–16. First, the plaintiff alleges that the defendant discriminated against him sometime in the 1970s when he applied for a position in the Firearms Section. *See id.* at 10. According to the plaintiff, he did not initially receive an interview, and he only subsequently received one after he spoke to a Congressman. *Id.* at 10. Mr. Thompson alleges that when he went for the interview, the interviewer stated something to the effect: "So you are Thompson. You are probably not qualified, but we'll do this interview." *See* Def.'s Statement at 1. Second, the plaintiff claims that in the mid to late 1970s, he took an exam to become a crime-scene search officer. According to

Mr. Thompson, after he took the exam, his Captain, George Salyer, told Mr. Thompson that he thought that Mr. Thompson had received one of the highest scores on the exam, if not the highest. Subsequently, though, the crime-scene unit neither contacted the plaintiff about his exam results nor considered him for the position. *See* Def.'s Statement at 2.

Third, the plaintiff claims that at some point when he was a member of the patrol division, he was required to split his weekend days off with a white female officer who had less seniority than he did. *See id.* Fourth, the plaintiff alleges that after he had scored well on the exam to become a Detective, a supervisor disciplined him without cause to prevent him from being promoted. After speaking to the Chief of the Capitol Police about this situation, the plaintiff received a promotion to the rank of Detective. *See* Def.'s Statement at 2–3.

Fifth, Mr. Thompson alleges that during the time that he was a Sergeant between 1991 and 1995, his supervisors prevented him from disciplining white officers. The plaintiff claims that whenever he disciplined a white officer, his supervisors would not approve his actions. *See* Def.'s Statement at 3. Sixth, the plaintiff charges that sometime between 1993 and 1995, his Lieutenant's recommendation that he be named Sergeant of the Month was rejected, despite the fact that the Capitol Police had given this honor to other sergeants who had performed substantially less work. *See id.*

On June 6, 1997, Mr. Thompson requested mediation from the Office of Compliance in his dispute with the Capitol Police. The Office of Compliance requires both parties in a mediation process to sign a "Mediation and Confidentiality Agreement." For reasons that are not clear from the record, the defendant refused to sign the agreement. Consequently, the mediator informed both parties that the mediation could not go forward. *See* Pl.'s Opp'n at 20.

On November 6, 1997, the plaintiff filed his complaint, which he has since amended three times. The third amended complaint contains two counts asserting claims for race-based and gender-based discrimination in violation of sections 201(a)(1) and (3) of the Congressional Accountability Act of 1995, 2 U.S.C. §§ 1311(a)(1) and (3). *See* Compl. at 1. After settlement negotiations failed, the defendant filed a motion for summary judgment. The plaintiff filed his opposition, and the defendant filed its reply. For the reasons that follow, the court will grant the defendant's motion for summary judgment.

## III. ANALYSIS

### A. Legal Standard

The defendant brings this motion for summary judgment, arguing that the court should dismiss because it lacks subject-matter jurisdiction since the plaintiff failed to exhaust his administrative remedies. In reviewing a motion to dismiss for lack of subject-matter jurisdiction under Federal Rule of Civil Procedure 12(b)(1), the court must accept the complaint's well-pled factual allegations as true and draw all reasonable inferences in the plaintiff's favor. *See, e.g., Pitney Bowes v. United States Postal Serv.*, 27 F.Supp.2d 15, 19 (D.D.C. 1998) (Urbina, J.). While the court must accept all well-pled allegations of fact, allegations that are overbroad and unsupported by specific factual averments are insufficient to state a claim upon which relief can be granted. *See DeVoren Stores Inc. v. Philadelphia*, 1990 WL 10003, *1 (E.D.Pa.1990); *Crowder v. Jackson*, 527 F.Supp. 1004, 1006 (W.D.Pa.1981).

On a motion to dismiss pursuant to Rule 12(b)(1), the plaintiff bears the burden of persuasion to establish subject-matter jurisdiction by a preponderance of the evidence. *See Darden v. United States* 18 Cl.Ct. 855, 859 (Fed.Cl.1989). In determining whether the plaintiff has met this burden, the court is sometimes required to look to matters outside of the pleadings.

*See Swine Flu Immunization Prods. Liab. Litig.*, 880 F.2d 1439, 1442 (D.C.Cir.1989).

### B. The Plaintiff Filed His Administrative Complaint Late

The Congressional Accountability Act subjects congressional employers, such as the Capitol Police, to potential liability for racial discrimination under Title VII of the Civil Rights Act of 1964. *See* 2 U.S.C. §§ 1401–1416. As a prerequisite to filing a claim in federal court, a party who believes that he or she has suffered discrimination must file a request for counseling with the Office of Compliance, a federal agency charged with administering certain aspects of the CAA. The CAA states that this request for counseling must be filed "not later than 180 days after the alleged violation." *See* 2 U.S.C. § 1402(a).

■ In the instant case, the parties do not dispute that the plaintiff filed a claim with the Office of Compliance on April 1, 1997, 188 days after Deputy Chief Fentress notified him of his termination. *See* Pl.'s Opp'n at 6; Mot. for Summ. J. at 4. The plaintiff, however, claims that he was going to take an exam for promotion to Lieutenant on October 5, 1996, and that since his termination prevented him from taking the exam, the fact that he could not take the Lieutenant's exam constituted a separate act of discrimination that fell within the limitations period.

The court disagrees. The Supreme Court has held that in employment discrimination cases, "the proper focus is upon the time of the discriminatory acts, not upon the time at which the consequences of the acts became most painful." *Delaware State College v. Ricks*, 449 U.S. 250, 258, 101 S.Ct. 498, 66 L.Ed.2d 431 (1980). In *Ricks*, Delaware State College denied the plaintiff tenure. The college then gave him a one-year "terminal" contract. After the one-year terminal contract expired, Mr. Ricks brought a claim of discrimination based on national origin. He argued that the limitations period

should begin to run upon the expiration of the terminal contract. The Supreme Court ruled that the limitations period began to run at the moment the college told Mr. Ricks that he had not received tenure:

> It appears that termination of employment at Delaware State College is a delayed, but inevitable consequence of the denial of tenure. In order for the limitation periods to commence with the date of discharge, Ricks would have to allege and prove that the manner in which his employment was terminated differed discriminatorily from the manner in which the College terminated other professors who also had been denied tenure.

*Id.* at 257–58, 101 S.Ct. 498.

In the instant case, Mr. Thompson would have to prove that he was not allowed to take the exam because of race-based discrimination *and* that other employees whom the Capitol Police had terminated were allowed to take the Lieutenant's exam. On the contrary, the plaintiff merely alleges that the Capitol Police discriminated against him because his wrongful termination prevented him from taking the exam. This can only be seen as a "delayed, but inevitable consequence" of his termination. *See Ricks*, 449 U.S. at 257–58, 101 S.Ct. 498. Thus, the refusal to allow the plaintiff to take the Lieutenant's exam does not constitute a separate act of discrimination independent of the plaintiff's termination itself. Accordingly, the last possible act of discrimination B the issuance of the plaintiff's termination notice B occurred on September 25, 1996.

■ The plaintiff raises a second argument in his attempt to rebut the defendant's statute of limitations defense. In short, the plaintiff argues that the defendant has engaged in a continuing violation of the CAA. *See, e.g., Guerra v. Cuomo*, 176 F.3d 547, 551 (D.C.Cir.1999) (stating that "The continuing violations doctrine applies in the civil rights context in order to avoid statute of limitations problems when an employer commits repeated, but

distinct, discriminatory acts, some inside and some outside of the limitations period.") (citing *Bazemore v. Friday,* 478 U.S. 385, 394–95, 106 S.Ct. 3000, 92 L.Ed.2d 315 (1986)). In the very case the plaintiff cites to support this proposition, however, the court states, "A continuing violation may be established by demonstrating a discriminatory policy which applies to a group of employees or by showing a series of related acts against a single individual, one or more of which falls within the limitations period." *Counts v. Reno,* 949 F.Supp. 1478, 1484 (D.Haw.1996). The plaintiff does not allege any other discriminatory acts that occurred within the limitations period, except for the failure to take the Lieutenant's exam. Because the court has determined that this exclusion did not constitute a separate discriminatory act from the plaintiff's termination that led to this result, the plaintiff cannot rely on a continuing violation theory to sustain jurisdiction.

### C. Equitable Tolling Does Not Apply

■ The Supreme Court has held that the filing of a timely charge of discrimination is not a jurisdictional prerequisite to a Title VII action. Rather, it is a requirement that is subject to waiver, estoppel, and equitable tolling. *See Zipes v. Trans World Airlines Inc.,* 455 U.S. 385, 393, 102 S.Ct. 1127, 71 L.Ed.2d 234 (1982). In *Zipes,* the Supreme Court noted that the portion of Title VII specifying the time for filing charges appears in a separate provision from the portion granting jurisdiction for actions brought under it. Furthermore, the Court observed that the section regarding the timely filing of claims does not speak in jurisdictional terms or refer in any other way to the jurisdiction of the district courts. *See id.* at 394, 102 S.Ct. 1127; *cf. Carlyle Towers Condominium Ass'n Inc. v. Federal Deposit Ins. Corp.,* 170 F.3d 301, 308 (2d Cir.1999) (holding FDIC-imposed time limits were subject to equitable tolling for similar reasons as in *Zipes* ). Similarly, the CAA provision that specifies a time for filing charges appears in a separate section from

the one covering jurisdiction, and does not make any mention of jurisdiction. *See* 2 U.S.C. § 1402(a), 2 U.S.C. § 1408(a).

Although the court holds that equitable tolling principles do apply to the CAA, the D.C. Circuit has held that the court's power to toll the statute of limitations "will be exercised only in extraordinary and carefully circumscribed instances." *See Mondy v. Secretary of the Army,* 845 F.2d 1051, 1057 (D.C.Cir.1988). In this case, the plaintiff cites *Cada v. Baxter Healthcare Corp.,* 920 F.2d 446 (7th Cir.1990), for the proposition that equitable tolling can overcome a statute-of-limitations defense if the plaintiff cannot obtain vital information bearing on the existence of the claim. *See* Pl.'s Op'n at 17. The plaintiff, however, fails to assert what "vital information" he would want or would need to help him survive the statute-of-limitations defense. Accordingly the court does not find this to be an "extraordinary and carefully circumscribed" instance suitable for equitable tolling. The court holds that equitable tolling does not apply in this case.

■ One final point on the statute-of-limitations issue merits discussion. Although the plaintiff only indirectly raised this theory, the defendant did not waive its limitations defense by appearing at the mediation requested by the plaintiff. In *Howell v. Department of the Army,* 975 F.Supp. 1293 (M.D.Ala.1997), the court rejected a theory that the defendant had waived its statute-of-limitations defense when it entered into settlement negotiations with the plaintiff. The court held that "the willingness of the Army to work with Howell towards a mutually satisfactory and swift resolution of his claim in no way prejudiced his rights or deprived him of any advantage or opportunity he would have enjoyed. The negotiation ... left Howell in no worse a position than if the Army had originally rejected his claim as time-barred." *Id.* at 1302. Similarly, in this case, the only action that the defendant took was to attend the initial mediation session. An appearance at a mediation session did not prejudice the rights of

the plaintiff, nor did it deprive him of any opportunity he would have enjoyed. Thus, the defendant's participation in mediation did not waive its limitations defense.

### D. The Plaintiff Failed to Exhaust His Administrative Remedies

Accordingly, the plaintiff cannot rely on equitable tolling to overcome the statute-of-limitations defense. Because the plaintiff filed his request for counseling 188 days after the defendant notified him of his termination, the court concludes that the plaintiff failed to exhaust his administrative remedies. In sum, the court holds that it lacks subject-matter jurisdiction over this case.

### IV. CONCLUSION

For all of these reasons, the court grants the defendant's motion for summary judgment. An order directing the parties in a fashion consistent with this Memorandum Opinion is separately and contemporaneously issued this 26th day of October 2000.