Carl C. BOWDRÉ, Plaintiff,

v.

Bill RICHARDSON, Secretary Department of Energy, Defendant.

No. CIV.A. 99–2602(RMU).

United States District Court, District of Columbia.

Jan. 25, 2001.

Carl Messneo, Mara Verheyden-Hilliard, Partnership for Civil Justice, Inc., Washington, DC, for Plaintiff.

Fred E. Haynes, Asst. U.S. Atty., Washington, DC, for Defendant.

## *MEMORANDUM OPINION*

### GRANTING IN PART AND DENYING IN PART THE DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

URBINA, District Judge.

## I. INTRODUCTION

Plaintiff Carl Bowdré ("the plaintiff" or "Mr. Bowdré") brings this employment discrimination case against the Department of Energy ("the defendant" or "the DOE"). The plaintiff, a former Equal Employment Opportunity ("EEO") investigator in the DOE's Office of Civil Rights, alleges that the defendant discriminated against him on the basis of his race (African–American), color (black), gender (male), and disability (post-traumatic stress disorder caused by job harassment and asthma) in retaliation for his prior EEO activity. Specifically, the plaintiff alleges that the defendant discriminated against him by creating a hostile work

environment in which the plaintiff was the target of threatening voice-mail messages, false sexual harassment charges, and vandalism to his car. This alleged discrimination culminated in the plaintiff's firing in 1997.

On September 29, 1999, the plaintiff filed a five-count complaint, alleging that: (1) the defendant subjected him to a hostile work environment from 1992 to 1994; (2) his supervisor retaliated against him in 1994 for his earlier complaints about the way she ran the office; (3) the defendant failed to provide a reasonable accommodation, in violation of the Rehabilitation Act of 1973, § 504, 29 U.S.C. § 794 ("the Rehabilitation Act"); (4) his supervisor created a hostile work environment by subjecting him to heightened surveillance, by harassing him intentionally, and by scrutinizing his work more closely; and (5) the defendant fired him in retaliation for his EEO activity.

The defendant moves for summary judgment. For the reasons that follow, the court will grant the defendant's motion for summary judgment on Count III, and will deny the defendant's motion on Counts I, II, IV, and V.

## II. BACKGROUND

Carl Bowdré, an African–American man who lives in Virginia, worked at the DOE from 1981 to 1997. *See* Compl. at 4. During the time period relevant to this case, Mr. Bowdré served as an Equal Employment Opportunity investigator in DOE's Office of Civil Rights (OCR). *See id.* at 1. He worked in this capacity from 1992 to 1994 and from 1995 until the agency terminated him in January 1997. *See* Compl. at 1, 11. In his complaint, the plaintiff states that during this time, "Carl Bowdré was the only African–American Equal Employment Opportunity (EEO) investigator in the Agency's Office of Civil Rights (OCR)." *Id.* at 5.

Throughout the time period at issue, Mary Katherine Hembree, who is white, was the director of the OCR's Complaints and Investigations office. *See id.* at 5. Mr. Bowdré alleges that from 1992 to 1994, Ms. Hembree subjected him to "repeated and pervasive conditions of discrimination, harassment and retaliation for prior protected activity." *Id.* The plaintiff portrays this hostile work environment as follows:

> Ms. Hembree would, inter alia, impose additional requirements on Mr. Bowdré that were not imposed on others, would assign trainees to review and monitor his performance, would single out his work product to be reviewed and supplemented by Mr. Bowdré's peers and subordinates, would embarrass him with public statements and conduct that reflected negatively (and inaccurately) on his performance, would remove cover sheets from his reports and then sanction him for submitting reports without cover sheets, and would arbitrarily edit his reports to prevent them from being finalized and to cause his work product to appear to be delayed.

*Id.*

Between 1992 to 1994, Mr. Bowdré complained to Jay Pagano, the director of the OCR, to William Garrett, the deputy director, and to Ms. Hembree to no avail. As a result of these complaints, Ms. Hembree allegedly retaliated against Mr. Bowdré by increasing the degree of her misconduct. *See id.* at 5–6. In the starkest example of this behavior, Mr. Bowdré alleges that Ms. Hembree manufactured two false charges of sexual harassment against Mr. Bowdré in the names of other women. In addition, she allegedly disseminated these charges widely, "resulting in profound humiliation and psychological harm to Mr. Bowdré." *See* Plaintiff's Opposition to Defendant's Motion for Summary Judgment ("Pl.'s Opp'n") at 2.

One woman whose name was allegedly used inappropriately, Deborah Daughtry, did not learn from the OCR for more than one year that her name was being used against the plaintiff, even though she had communications with Ms. Hembree about

other EEO matters. *See* Pl.'s Opp'n at 2. In his complaint, Mr. Bowdré claims that the second complainant, Heather Draughn, never signed the EEO complaint and "indicated that there was no substance to the charges." *See* Compl. at 7. Mr. Bowdré learned of the second allegation (Ms. Draughn's) on July 27, 1994. *See* Pl.'s Opp'n at 5. He states that he suffered depression as a consequence of "two years of unabated retaliation and discrimination." *Id.*

In response to the hostile work environment claim, the defendant argues that "It is, indeed, extraordinary for one such as plaintiff, who threatened to kill Ms. Hembree, to argue that her activities in carrying out her duties constituted 'harassment' of him simply because she knew that he had threatened to kill her." Mot. for Summ. J. at 13. Rejecting this characterization, the plaintiff acknowledges that four days after learning of Ms. Draughn's complaint, he suffered a "breakdown." *See* Pl.'s Opp'n at 5. Indeed, on July 31, 1994, he presented himself for admission at the emergency room at Andrews Air Force Base complaining of painful thoughts, including "suicidal and homicidal ideations." *See* Pl.'s Opp'n at 2. Subsequently, Mr. Bowdré went on medical leave due to his psychological condition and did not return to the DOE until February 1995. *See* Compl. at 8.

Effective August 1, 1994, the DOE barred Mr. Bowdré from entering the premises of the DOE and placed him on forced administrative leave. *See* Pl.'s Opp'n at 6. On Aug. 30, 1994, the plaintiff's lawyer, Suzanne Levin, had a meeting with Mr. Pagano about the plaintiff's claims of retaliation and discrimination. *See* Pl.'s Opp'n at 7. According to the plaintiff, Mr. Pagano acknowledged at the meeting that Mr. Bowdré's complaints would be considered "pending" at the time, and advised Ms. Levin that because the plaintiff was physically barred from the DOE, the time limitations would be tolled and the normal time frame for processing an EEO complaint would not apply, until Mr. Bowdré's return to regular work status. *See* Pl.'s Opp'n at 7–8.

Mr. Bowdré returned to work in February 1995. *See* Compl. at 8. On February 17, 1995, and on several occasions thereafter, he requested what he called a reasonable accommodation for the medical conditions he had developed as a consequence of the alleged workplace discrimination and retaliation. *See id.* Specifically, "Plaintiff's physician and plaintiff repeatedly requested that Mr. Bowdré be placed in a position whereby he would not be exposed to the same managers who had perpetrated, facilitated or refused to halt the harassment that caused Mr. Bowdré's impairment and medical condition." *Id.* Mr. Bowdré states that the OCR refused his requests. *See id.* The defendant, however, states that it is undisputed that Mr. Bowdré was transferred away from Ms. Hembree's supervision. *See* Mot. for Summ. J. at 3.

The plaintiff alleges that the hostile work environment continued after his return to work in February 1995. For example, on May 17, 1995, his car tire was slashed. *See* Compl. at 7. His car was parked in the North section of the DOE's Forrestal Building garage, which is secured by federal law enforcement officers, with access restricted to employees and those with special clearance. *See id.* On May 25, 1995, his car tire was again slashed while he was parked in the Forrestal Building garage. *See id.*

During the fall of 1995, the DOE was investigating Mr. Bowdré's EEO complaints. *See* Compl. at 8. In October 1995, the investigator deposed Ms. Hembree and other top OCR officials. *See id.* Mr. Bowdré alleges that in October 1995, his car was once again vandalized while he was parked in the Forrestal Building garage. *See id.* at 9. The plaintiff also alleges that on or about the day of the depositions, he received a number of racist telephone messages threatening him with personal injury if he continued to press

his complaint. *See id.* The voice allegedly said, "I'm warning you, mother fucker. You had better not fuck shit up." *Id.* In addition, the voice allegedly warned him, "Listen, nigger. Leave the shit alone. We are going to fuck you up ... You ever notice the fucking tires got fucking cut?" *Id.*

The DOE's report of investigation, performed by an office independent of the OCR, stated that "Many witnesses provide evidence that would support the charge that DOE managers created and subjected the Complainant to a hostile work environment...." *Id.*

The complaint alleges that after Mr. Bowdré's return to work in February 1995, the OCR transferred him to the Germantown, Maryland office, prohibited him from using the shuttle bus between the Washington D.C. and Germantown offices, and required him to provide a detailed itinerary of his hour-by-hour whereabouts in advance of visiting the D.C. office. *See* Compl. at 11. Mr. Bowdré's daily itinerary was allegedly conveyed to Ms. Hembree. *See id.*

In October 1996, the DOE notified Mr. Bowdré that he would be separated from service on January 3, 1997 by a Reduction in Force ("RIF"). *See id.* Mr. Bowdré claims that Corliss Moody, the director of the Office of Economic Impact and Diversity, who knew about Mr. Bowdré's complaints, intentionally altered the RIF so that he would be separated from service. *See id.* at 11–12.

On September 29, 1999, the plaintiff filed his complaint in this court. The defendant now moves for summary judgment.

### III. DISCUSSION

#### A. Legal Standard

Federal Rule of Civil Procedure 56(c) states that summary judgment is appropriate when the pleadings and evidence demonstrate that there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law. *See* FED. R. CIV. P. 56(c); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986); *Diamond v. Atwood*, 43 F.3d 1538, 1540 (D.C.Cir.1995). To determine what facts are "material," a court must look to the substantive law on which each claim rests. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). A "genuine issue" is one whose resolution could establish an element of a claim or defense and, therefore, affect the outcome of the action. *See Celotex*, 477 U.S. at 322, 106 S.Ct. 2548; *Anderson*, 477 U.S. at 248, 106 S.Ct. 2505.

In ruling on a motion for summary judgment, the court must draw all justifiable inferences in the nonmoving party's favor and accept the nonmoving party's evidence as true. *See Anderson*, 477 U.S. at 255, 106 S.Ct. 2505. All evidence and the inferences drawn therefrom must be considered in the light most favorable to the nonmoving party. However, a nonmoving party must establish more than "the mere existence of a scintilla of evidence" in support of its position. *See Anderson*, 477 U.S. at 252, 106 S.Ct. 2505. To prevail on a motion for summary judgment, the moving party must show that the nonmoving party "fail[ed] to make a showing sufficient to establish the existence of an element essential to that party's case, and in which that party will bear the ultimate burden of proof at trial." *See Celotex*, 477 U.S. at 325, 106 S.Ct. 2548. By pointing to the absence of evidence proffered by the nonmoving party, a moving party may succeed on summary judgment. *See id.*

In addition, the nonmoving party may not rely solely on allegations or conclusory statements. *See Greene v. Dalton*, 164 F.3d 671, 674 (D.C.Cir.1999). Rather, the nonmoving party "must come forward with specific facts" that would enable a reasonable jury to find in its favor. *See id.* If the evidence "is merely colorable, or is not significantly probative, summary judgment

may be granted." *Anderson*, 477 U.S. at 249–50, 106 S.Ct. 2505 (internal citations omitted). Finally, the D.C. Circuit has directed that because it is difficult for a plaintiff to establish proof of discrimination, the court should view summary-judgment motions in such cases with special caution. *See Aka*, 116 F.3d at 879; *see also Johnson v. Digital Equip. Corp.*, 836 F.Supp. 14, 18 (D.D.C.1993).

### B. Analysis

#### 1. Counts I and II

##### a. The Defendant's Statute of Limitations Argument

In Count I, the plaintiff alleges that he was subjected to a hostile work environment from 1992 to 1994 on the basis of his race and color, and in retaliation for his prior EEO activity[1], in violation of Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e *et seq.* ("Title VII"). Among other things, he claims that during this continuing violation, his OCR supervisors, and particularly Ms. Hembree, subjected his work to heightened surveillance, gave him assignments that were different and more complex than those given to other employees, and publicly embarrassed him in the workplace with Ms. Hembree's comments. *See* Compl. at 14. In Count II, the plaintiff alleges a second Title VII violation, namely, that his supervisor retaliated against him in 1994 on the basis of his race and for his earlier complaints about the way she ran the office. *See id.* at 15. The starkest allegation of the hostile work environment is the plaintiff's claim that Ms. Hembree fabricated complaints of sexual harassment against him in the names of other women. *See id.;* Pl.'s Opp'n at 4.

The defendant moves to dismiss these two counts on the ground that the plaintiff did not file his EEO complaint until Aug. 2, 1995, while the alleged wrongdoing occurred from 1992 to 1994. Thus, the defendant argues, the plaintiff failed to exhaust his administrative remedies. *See* Mot. for Summ. J. at 7. As a general rule, parties "must exhaust prescribed administrative remedies before seeking relief from federal courts." *McCarthy v. Madigan*, 503 U.S. 140, 144–45, 112 S.Ct. 1081, 117 L.Ed.2d 291 (1992). Accordingly, a party must timely file all applicable administrative complaints and appeals in order to bring a claim in federal court. *See Bowden v. United States*, 106 F.3d 433, 437 (D.C.Cir.1997). Moreover, "[b]ecause untimely exhaustion of administrative remedies is an affirmative defense, the defendant bears the burden of pleading and proving it." *Id.*

In this case, the defendant argues that the plaintiff failed to exhaust his administrative remedies because he failed to seek counseling with an EEO counselor within 45 days of the alleged discriminatory act and then failed to file a timely formal complaint with the agency. *See* 29 C.F.R. § 1614.105; Mot. for Summ. J. at 7–8. The defendant fails to carry its burden of proving an untimely exhaustion of administrative remedies.

■ The court finds that there is a genuine factual dispute that allows Counts I and II to survive the defendant's motion for summary judgment. In his opposition to the defendant's motion for summary judgment, the plaintiff states that his then-counsel, Suzanne Levin, made initial contact with Jay Pagano, the Director of the OCR, to assert the plaintiff's discrimination and retaliation claims. *See* Pl.'s Opp'n at 7. In addition, Ms. Levin met with Mr. Pagano regarding these claims on August 30, 1994. Since Mr. Bowdré's last day of work before his forced leave was July 31, 1994, this August 30, 1994 meeting occurred within 45 days of his last day at work (which pertains to Count I's continuous violation claim). The August 30, 1994

---

1. Mr. Bowdré had engaged in prior EEO activity in 1990, which, he states, was settled with corrective action taken. *See* Compl. at

13. He claims that Ms. Hembree knew about this prior activity. *See id.*

meeting also occurred within 45 days of July 27, 1994, the day the plaintiff supposedly learned about the second sexual harassment claim allegedly manufactured by Ms. Hembree (which pertains to Count II's retaliation and discrimination claim). *See id.*

The plaintiff asserts that Ms. Levin brought the plaintiff's claims to the DOE's attention by articulating them in the meeting with Mr. Pagano. *See id.* Ms. Levin apparently reported that Mr. Pagano had said the plaintiff's claims were considered "pending" at that time, and told her that because her client was physically barred from the DOE, "the time limitations would be tolled and the normal time frame for processing an EEO complaint would not apply, until Mr. Bowdré's return to regular work status." Pl.'s Opp'n at 8. In support of his version of what happened at the August 30, 1994 meeting, the plaintiff presents an affidavit from Ms. Levin, who confirms the plaintiff's version of events. *See* Pl.'s Supp. Statement of Genuine Issues, Ex. 5.

As noted above, in ruling on a motion for summary judgment, the court must draw all justifiable inferences in the nonmoving party's favor and accept the nonmoving party's evidence as true. *See Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 255, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). Accordingly, the court must accept the plaintiff's account of the August 30, 1994 meeting as true.

### b. The Application of Equitable Tolling

The question then becomes: assuming the DOE led the plaintiff to believe that the 45–day time frame would be tolled, can the DOE now claim that the plaintiff failed to exhaust his administrative remedies? The answer is a resounding no.

■ The Supreme Court has held that the filing of a timely charge of discrimination is not a jurisdictional prerequisite to a Title VII action. Rather, it is a requirement that is subject to waiver, estoppel, and equitable tolling. *See Zipes v. Trans World Airlines Inc.,* 455 U.S. 385, 393, 102 S.Ct. 1127, 71 L.Ed.2d 234 (1982). The D.C. Circuit, however, has held that the court's power to toll the statute of limitations "will be exercised only in extraordinary and carefully circumscribed instances." *See Mondy v. Secretary of the Army,* 845 F.2d 1051, 1057 (D.C.Cir.1988). Thus, the plaintiff will not be afforded extra time to file without exercising due diligence, and the plaintiff's excuse must be more than a "garden variety claim of excusable neglect." *Irwin v. Department of Veterans Affairs,* 498 U.S. 89, 96, 111 S.Ct. 453, 112 L.Ed.2d 435 (1990).

In a series of decisions, the D.C. Circuit laid out the boundaries for the application of the equitable tolling doctrine. *See, e.g., Mondy,* 845 F.2d at 1057; *Hosey v. Slater,* 1999 WL 1215953, *1 (D.C.Cir.1999); *Washington v. Washington Metro. Area Transit Auth.,* 160 F.3d 750, 753 (D.C.Cir. 1998); *Jarrell v. U.S. Postal Serv.,* 753 F.2d 1088, 1091–92 (D.C.Cir.1985); *see also Battle v. Rubin,* 121 F.Supp.2d 4 (D.D.C.2000) (Urbina, J.); *Thompson v. Capitol Police Bd.,* 120 F.Supp.2d 78 (D.D.C.2000) (Urbina, J.). In *Jarrell,* for example, the D.C. Circuit tolled the deadline for an administrative complaint. *See Jarrell,* 753 F.2d 1088 (D.C.Cir.1985). The *Jarrell* plaintiff alleged that he had not contacted an EEO counselor in a timely manner since he had relied on the assurances of a different EEO officer that the officer would attempt to have certain information expunged from the plaintiff's employment records. The court held that "The failure to contact an EEO Counselor within thirty days of the alleged discriminatory event may be excused if it is the result of justifiable reliance on the advice of another government officer." *Id.* at 1092.

In this case, Mr. Bowdré's justifications for arguably missing the administrative deadline do, in fact, fall into the narrow category in which the D.C. Circuit has allowed the application of equitable tolling.

By pointing to Mr. Pagano's statements during the August 30, 1994 meeting about the tolling of the administrative deadlines (which, again, the court must accept as true for purposes of this motion), the plaintiff has demonstrated either affirmative misconduct or imparting of misinformation on the government's part that would justify a toll. *See Washington,* 160 F.3d at 753; *Jarrell,* 753 F.2d at 1091–92.

The purpose of the 45–day initial-contact requirement is to ensure that agencies have sufficient notice of their employees' adverse claims. *See Zipes,* 455 U.S. at 398, 102 S.Ct. 1127. By directing his lawyer to notify Mr. Pagano of his claims and by having his lawyer meet with Mr. Pagano during the 45–day period, the plaintiff diligently advanced his EEO complaint and placed the DOE on notice quickly and effectively. Accordingly, the court holds that Counts I and II may proceed to trial.

### 2. Count III

■ In Count III, the plaintiff alleges that the defendant failed to provide a reasonable accommodation, in violation of the Rehabilitation Act of 1973, § 504, 29 U.S.C. § 794 ("the Rehabilitation Act"), when the DOE required the plaintiff to remain in the Office of Economic Impact and Diversity after he returned to work in February 1995. The Rehabilitation Act is the only avenue of redress for a federal employee's claim of discrimination based on disability.

In this case, the plaintiff claims that after he returned to work from a medical leave in February 1995, his doctors told the defendant that he had developed a psychological condition "due to the misconduct of agency officials, and that in order to work, Mr. Bowdré required the reasonable accommodation of being transferred outside of the supervision of those managers who had committed, facilitated, or refused to stop the misconduct that caused

Mr. Bowdré's medical condition." *See* Compl. at 16. Specifically, the plaintiff alleges that on or about February 17, 1995, November 9, 1995, and March 15, 1996, he requested this accommodation. *See id.*

The defendant counters that it made a reasonable accommodation by transferring the plaintiff away from the supervisor with whom he had the problem, but that the plaintiff unreasonably asked to be transferred out of the entire department. *See* Mot. for Summ. J. at 8. Addressing this question recently, the Second Circuit held that whether a requested accommodation is reasonable should be evaluated on a case-by-case basis. *See Kennedy v. Dresser Rand Co.,* 193 F.3d 120, 122 (2d Cir. 1999). "There is a presumption, however, that a request to change supervisors is unreasonable, and the burden of overcoming that presumption (i.e., of demonstrating that, within the particular context of the plaintiff's workplace, the request was reasonable) therefore lies with the plaintiff." *Id.* at 122–23.

■ The court rules that the plaintiff has not carried his burden of showing that the defendant failed to make a reasonable accommodation for his alleged disability.[2] Even assuming *arguendo* that the plaintiff does suffer from a disability that would qualify him for relief under the Rehabilitation Act, the DOE made a reasonable accommodation by transferring him away from Ms. Hembree's supervision. The plaintiff simply does not carry his burden of showing that transferring him away from all his supervisors, all the way up the chain of command, amounts to a reasonable accommodation.

Making an eminently reasonable accommodation, the defendant designed its action to separate the plaintiff from the one person—Ms. Hembree—whom the plaintiff himself cites as the main perpetrator of

---

**2.** For the sake of argument, the court will assume that the plaintiff does, indeed, have a disability that qualifies him to seek relief under the Rehabilitation Act. The parties spend considerable energy on this issue. Since the court will reject the plaintiff's Rehabilitation Act claim on a different ground, however, it need not consider this issue.

the alleged hostile work environment and harassment. In addition, because the vast majority of the plaintiff's accusations center on Ms. Hembree—including the claims referring to the defendant's most egregious conduct, the alleged fabrication of sexual harassment charges against the plaintiff—and because other supervisors play far less prominent roles, the defendant's action amounted to a reasonable accommodation under the circumstances. Thus, the court will grant the defendant's motion for summary judgment on Count III.

### 3. Count IV

In Count IV, the plaintiff claims that the defendant retaliated against him and discriminated against him on the basis of his race after his return to work in February 1995. *See* Compl. at 17. Specifically, the plaintiff alleges that the defendant created a hostile work environment in violation of Title VII by subjecting him to heightened surveillance, by intentionally harassing him, and by scrutinizing his work more closely. *See id.* at 17–18. In addition, the plaintiff alleges that his car tires were slashed three times in a secure government-only garage, and that he received voice mails warning him not to pursue his complaints against the DOE, telling him, among other things, "Listen, nigger. Leave the shit alone. We're going to fuck you up ... You ever notice the fucking tires got fucking cut?" Compl. at 9.

### a. Legal Standard for a Hostile Work Environment Violation under Title VII

■ Title VII prohibits an employer from creating or condoning a discriminatorily hostile or abusive work environment. *See Meritor Savings Bank, FSB v. Vinson,* 477 U.S. 57, 64, 106 S.Ct. 2399, 91 L.Ed.2d 49 (1986). Title VII makes it unlawful for an employer to "discriminate against any individual with respect to compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or nation of origin." 42 U.S.C. § 2000e–2(a)(1). The

Supreme Court has made it clear that the language "terms, conditions, or privileges" is not limited to economic or tangible discrimination and may include psychological harm. *See Meritor,* 477 U.S. at 64, 106 S.Ct. 2399. In addition, the Court has held that "When the workplace is permeated with discriminatory intimidation, ridicule, and insult that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment, Title VII is violated." *Harris v. Forklift Sys., Inc.,* 510 U.S. 17, 22, 114 S.Ct. 367, 126 L.Ed.2d 295 (1993) (quotation omitted). On the other hand, conduct that does not create a hostile or abusive environment is beyond the purview of Title VII. *See id.* at 21, 114 S.Ct. 367.

To establish a claim of hostile work environment, a plaintiff must demonstrate "(1) that he or she suffered intentional discrimination because of race; (2) the discrimination was pervasive and regular; (3) the discrimination detrimentally affected the plaintiff; (4) the discrimination would detrimentally affect a reasonable person of the same race in that position; and (5) the existence of *respondeat superior* liability." *Aman v. Cort Furniture Rental Corp.,* 85 F.3d 1074, 1081 (3d Cir.1996).

■ The Supreme Court has held that a finding of a hostile work environment depends on the totality of the circumstances, including the frequency of the discriminatory conduct, its severity, its offensiveness, and whether it interferes with an employee's work performance. *See Faragher v. City of Boca Raton,* 524 U.S. 775, 787–88, 118 S.Ct. 2275, 141 L.Ed.2d 662 (1998); *Harris,* 510 U.S. at 23, 114 S.Ct. 367. Moreover, the harassment need not be racial in content to create a racially hostile work environment. Rather, it must be shown that "had the plaintiff been white she would not have been treated in the same manner." *Aman,* 85 F.3d at 1083. In the final analysis, the Supreme Court circumscribed the definition of a hostile

work environment so that "[t]hese standards for judging hostility are sufficiently demanding to ensure that Title VII does not become a 'general civility code.'" *Faragher,* 524 U.S. at 788, 118 S.Ct. 2275 (citations omitted).

### b. Application of Legal Standard

■ In this case, the plaintiff has presented sufficient evidence of a hostile work environment to survive summary judgment. Reviewing the totality of the circumstances—including, for example, the allegations that his car's tires were slashed three different times in a secure, government-only garage, that his supervisor fabricated sexual harassment charges against him, and that he received threatening voice mail messages that contained vicious racial slurs—the court concludes that the plaintiff has raised genuine issues of material fact about whether he had to endure "severe or pervasive" harassment that amounted to a hostile work environment. *See Barbour v. Browner,* 181 F.3d 1342, 1347–48 (D.C.Cir.1999). In sum, the plaintiff presents evidence that rises well above a mere allegation that the defendant violated a "general civility code." *See Faragher,* 524 U.S. at 788, 118 S.Ct. 2275 (citations omitted). Accordingly, the court will deny the defendant's motion for summary judgment on Count IV.

### 4. Count V

In Count V, the plaintiff alleges that the defendant initiated the reduction in force (RIF) that led to his termination in 1997 to punish the plaintiff for engaging in protected EEO activity, and as "part and parcel of the ongoing race and color based discrimination" that the defendant committed. *See* Compl. at 18–19. The defendant counters that the RIF was legitimate and nondiscriminatory, and resulted in another employee "bumping" the plaintiff from his position. *See* Mot. for Summ. J. at 13–14.

### a. The *McDonnell Douglas* Framework

To prevail on a claim of race discrimination under Title VII, the Supreme Court has held that a plaintiff must follow a three-part burden-shifting analysis. *See McDonnell Douglas v. Green,* 411 U.S. 792, 802, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973). The Court explained this scheme as follows:

First, the plaintiff has the burden of proving by the preponderance of the evidence a *prima facie* case of discrimination. Second, if the plaintiff succeeds in proving the *prima facie* case, the burden shifts to the defendant 'to articulate some legitimate, nondiscriminatory reason for the employee's rejection.' Third, should the defendant carry this burden, the plaintiff must then have an opportunity to prove by a preponderance of the evidence that the legitimate reasons offered by the defendant were not its true reasons, but were a pretext for discrimination.... The ultimate burden of persuading the trier of fact that the defendant intentionally discriminated against the plaintiff remains at all times with the plaintiff.

*Texas Dep't of Community Affairs v. Burdine,* 450 U.S. 248, 252–53, 101 S.Ct. 1089, 67 L.Ed.2d 207 (1981) (quoting *McDonnell Douglas,* 411 U.S. at 802, 93 S.Ct. 1817 (citations omitted)).

Thus, the plaintiff must first establish a prima-facie case of prohibited discrimination. *See McDonnell Douglas,* 411 U.S. at 802, 93 S.Ct. 1817; *Aka v. Washington Hosp. Ctr.,* 156 F.3d 1284, 1288 (D.C.Cir. 1998) (*en banc*) ("under the *McDonnell Douglas* framework, the complainant must first establish a prima facie case"); *see also Reeves v. Sanderson Plumbing Products, Inc.,* 530 U.S. 133, 120 S.Ct. 2097, 2105, 147 L.Ed.2d 105 (2000) (the *McDonnell Douglas* framework is fully applicable in ADEA cases).

If the plaintiff succeeds in making a prima-facie case, the burden shifts to the employer to articulate a non-discriminatory reason for its action. The employer's burden, however, is merely one of production. *See Texas Dep't of Community Af-*

fairs v. Burdine, 450 U.S. 248, 254–55, 101 S.Ct. 1089, 67 L.Ed.2d 207 (1981). The employer "need not persuade the court that it was actually motivated by the proffered reasons. It is sufficient if the defendant's evidence raises a genuine issue of fact as to whether it discriminated against the plaintiff." Id. If the employer is successful, the burden shifts back to the plaintiff to show that the defendant's proffered reasons are pretextual and that unlawful discrimination was the real reason for the action. See McDonnell Douglas, 411 U.S. at 802–805, 93 S.Ct. 1817; St. Mary's Honor Ctr. v. Hicks, 509 U.S. 502, 508, 113 S.Ct. 2742, 125 L.Ed.2d 407 (1993).

The defendant's explanation of its legitimate reasons must be "clear and reasonably specific" so that the plaintiff is "afforded a full and fair opportunity to demonstrate pretext." See Burdine, 450 U.S. at 258, 101 S.Ct. 1089 (citation omitted). A subjective reason can be legally sufficient, legitimate, and nondiscriminatory if the defendant articulates a clear and reasonably specific factual basis upon which it based its subjective opinion. See id. As the Eleventh Circuit has explained:

> [I]t might not be sufficient for a defendant employer to say it did not hire the plaintiff applicant simply because "I did not like his appearance" with no further explanation. However, if the defendant employer said, "I did not like his appearance because his hair was uncombed and he had dandruff all over his shoulders," or ... "because he came to the interview wearing short pants and a T-shirt," the defendant would have articulated a "clear and reasonably specific" basis for its subjective opinion—the applicant's bad (in the employer's view) appearance. That subjective reason would therefore be a legally sufficient, legitimate, nondiscriminatory reason for not hiring the plaintiff applicant.

Chapman v. AI Transport, 229 F.3d 1012, 1034 (11th Cir.2000) (en banc).

Once the defendant carries its burden of articulating a "legitimate, nondiscriminatory reason" for the employee's rejection, the plaintiff must then have an opportunity to prove by a preponderance of the evidence that the legitimate reasons offered by the defendant were not its true reasons, but rather were a pretext for discrimination. See McDonnell Douglas, 411 U.S. at 802, 93 S.Ct. 1817. "That is, the plaintiff may attempt to establish that he was the victim of intentional discrimination 'by showing that the employer's proffered explanation is unworthy of credence" ' and that the plaintiff's membership in a protected class was the true reason for the employment action. See Reeves, 120 S.Ct. at 2106, 120 S.Ct. 2097 (quoting Burdine, 450 U.S. at 256, 101 S.Ct. 1089); see also Aka, 156 F.3d at 1290; Mungin v. Katten Muchin & Zavis, 116 F.3d 1549, 1554 (D.C.Cir.1997).

Both the Supreme Court and the D.C. Circuit have ruled that the burden-shifting scheme becomes irrelevant once both parties have met the burdens discussed above. See Reeves, 120 S.Ct. at 2106; Aka, 156 F.3d at 1289. At that point, the relevant inquiry is whether there is sufficient evidence from which a reasonable trier of fact could find in favor of the plaintiff, although "the trier of fact may still consider the evidence establishing the plaintiff's prima facie case and inferences properly drawn therefrom ... on the issue of whether the defendant's explanation is pretextual." See Reeves, 120 S.Ct. at 2106 (citing Burdine, 450 U.S. at 255 n. 10, 101 S.Ct. 1089); see also Aka, 156 F.3d at 1290; Mungin, 116 F.3d at 1554. In Aka, the D.C. Circuit found that the plaintiff had presented no evidence directly suggesting discrimination, but instead presented evidence that the defendant's proffered justification was false. The Aka court ruled that simply casting doubt on the employer's proffered justification did not automatically enable the plaintiff to survive summary judgment. See Aka, 156 F.3d at 1290–91. Rather, "the plaintiff's attack on the employer's explanation must always be assessed in

light of the total circumstances of the case." *Id.* at 1291.

In sum, once an employer has met its burden of advancing a nondiscriminatory reason for its actions, the focus of proceedings at summary judgment:

> will be on whether the jury could infer discrimination from the combination of (1) the plaintiff's prima facie case; (2) any evidence the plaintiff presents to attack the employer's proffered explanation for its actions; and (3) any further evidence of discrimination that may be available to the plaintiff (such as independent evidence of discriminatory statements or attitudes on the part of the employer) or any contrary evidence that may be available to the employer (such as evidence of a strong track record in equal opportunity employment).

*See Aka,* 156 F.3d at 1289.

### b. Application

In this case, the defendant does not contest that the plaintiff has established a prima-facie case of retaliation. *See* Mot. for Summ. J. at 13. As the defendant itself notes, the plaintiff:

> complained that he was being discriminated and retaliated against for actions protected by Title VII, he was removed thereafter from the federal service pursuant to a reduction-in-force ("RIF"), and the RIF occurred fairly close in time to his protected activity and was carried out by persons who had knowledge of his protected activity.

*Id.* at 13. The defendant satisfies its burden of production, however, by offering a legitimate, nondiscriminatory reason for the plaintiff's termination. That is, the defendant selected a position in the Office of Small and Disadvantaged Business Utilization ("the Office") for elimination and therefore, the person who held that position, Mr. James Dixon, "bumped" the plaintiff from his position. *See id.* at 13–14. In support of its assertion, the defendant submits an affidavit from Mr. Percy McCraney, the former Director of the Office, who states that "I do not recall any discussion of Carl Bowdre [sic] during my discussions with Ms. Moody concerning the reduction-in-force as it affected my office." Mot. for Summ. J., Ex. E at 2.

■ The plaintiff responds by arguing that he has presented sufficient evidence to call into question whether the defendant's profferred reason for the RIF was pretextual. The court agrees, and will deny summary judgment on this count. In its opposition, the plaintiff raises a number of "irregularities" that could support the inference that the RIF was retaliatory and/or discriminatory. *See* Pl.'s Opp'n at 32–33. Applying the D.C. Circuit standard, the court concludes that by considering the plaintiff's prima-facie case, the evidence the plaintiff presented to attack the defendant's proffered explanation for the RIF, and the additional evidence of discrimination that the plaintiff alleges permeated his work environment at the DOE, a reasonable jury could infer that the RIF was retaliatory and/or discriminatory in nature. *See Aka,* 156 F.3d at 1289. Accordingly, the court will deny the defendant's motion for summary judgment on Count V.

### IV. CONCLUSION

For all of these reasons, the court grants in part and denies in part the defendant's motion for summary judgment. Specifically, the court grants the defendant's motion for summary judgment on Count III, and denies the defendant's motion on Counts I, II, IV, and V. An order directing the parties in a fashion consistent with this Memorandum Opinion is separately and contemporaneously issued this 25 day of January, 2001.

### *ORDER*

### GRANTING IN PART AND DENYING IN PART THE DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

For the reasons stated in this court's Memorandum Opinion separately and contemporaneously issued,

It is this 25 day of January, 2001,

**ORDERED** that the defendant's motion for summary judgment is **GRANTED IN PART** and **DENIED IN PART**; and it is

**FURTHER ORDERED** that the court **GRANTS** the defendant's motion for summary judgment on Count III, and **DENIES** the defendant's motion for summary judgment on Counts I, II, IV, and V.

**SO ORDERED.**